**D & M HEALTHCARE, INC., et al., Appellants (Plaintiffs below),**

v.

**Joseph E. KERNAN, in his official capacity as Governor of the State of Indiana, et al., Appellees (Defendants below).**

No. 49S05–0310–CV–437.

Supreme Court of Indiana.

Dec. 17, 2003.

Peter J. Rusthoven, J. Michael Grubbs, Stanley C. Fickle, Deborah Pollack–Milgate, Mark J. Crandley, Thomas F. Shea, Indianapolis, IN, Attorneys for Appellants.

Karl L. Mulvaney, Nana Quay–Smith, Rafael A. Sanchez, Jon B. Laramore, Counsel to Governor, Steve Carter, Attorney General of Indiana, Gary Damon Secrest, Chief Counsel, Frances H. Barrow, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellees.

BOEHM, Justice.

House Enrolled Act 1866 as passed by the 2001 General Assembly would prohibit the Family and Social Services Administration ("FSSA") from adopting rules that would reduce reimbursements to nursing facilities. The bill was passed by both houses but the Governor vetoed it and delivered the bill back to the House after the legislative session had adjourned. The Plaintiffs are several nursing home facilities who seek a declaratory judgment that House Enrolled Act 1866 became law despite the Governor's veto. The Plaintiffs claim that the Governor's veto, subsequently sustained by a vote of 85–1, was ineffective because the Governor's veto message was delivered six months before the Indiana Constitution calls for it to be returned to the legislature. The trial court entered a judgment in favor of the Defendants but the Court of Appeals reversed, agreeing with the Plaintiffs that the Governor's attempted veto did not prevent the bill from becoming law. This Court granted transfer.

For the reasons explained in Part II, we conclude there was no violation of the constitution. But the short answer to the Plaintiffs' claim is set forth in Part I. In summary, if there is any irregularity, it is

not a matter the courts have any business entertaining because any departure from prescribed procedure was wholly trivial and provides no basis to invalidate the Governor's veto.

### Why We Are Not Recusing

The parties cite a number of bills over the past twenty years that, like the bill involved in this case, were also vetoed and returned by Governors Orr, Bayh, and O'Bannon before the next legislative session. Among these is a bill providing a raise in pay for all state judges and legislators.[1] The issue presented in this case is therefore of intense interest to both judges and legislators.

This important legislation was long overdue. Unlike many government employees, legislators, judges, and elected executive officers receive no annual salary review. Even if the veto had been overridden, judicial and legislative salaries would not have kept up with inflation since the last pay adjustment. The State has failed to address judicial pay since 1995, with the last adjustment in 1997. This is particularly egregious because judges participate in the state medical plan and bear the costs shifted by the State to its employees in recent years, but do not receive the compensating allowance given to executive branch employees. As a result, judges have not only seen declines since 1995 in real income measured by cost of living, and they now have their net dollars reduced as well. Legislators have other employment and executive officers typically serve for a period of time and return to the private sector. Most judges, on the other hand, are full-time career government employees. Many are principal breadwinners and are dependent on their salaries to provide for their families and educate their children.

Acting in our capacity as leaders of the judicial branch, members of this Court have attempted to persuade the legislature that it should frequently revise judicial pay. Indeed, we have specifically contended that the State should place legislative, executive, and judicial salaries on a regular system of review to reflect inflation without the large, irregular, and sometimes long-delayed increases generated by sporadic individual legislation. We have also argued to both executive and legislative officers that failure to have predictable, modest pay adjustments costs the State substantially in financial terms through high turnover and early retirement and also in efficiency through loss of morale. We even spoke directly to Governor O'Bannon in favor of the 2001 legislative and judicial pay bill. Therefore, although we have expressed no view on the validity of the veto, we have expressed positions in public on the desirability of vetoed legislation that we assume would be affected by the ruling on this case.

Our personal financial interests and expressed views would normally preclude participation in this case. Yet we must address this claim because there is no one else to do it. *United States v. Will,* 449 U.S. 200, 211–16, 101 S.Ct. 471, 66 L.Ed.2d 392 (1980) (because every judge had an interest in the outcome of the case involving judicial salaries, the "Rule of Necessity" required that they not recuse themselves); *Evans v. Gore,* 253 U.S. 245, 246–48, 40 S.Ct. 550, 64 L.Ed. 887 (1920) (taxation of judicial salaries), *overruled on other grounds, United States v. Hatter,* 532 U.S. 557, 121 S.Ct. 1782, 149 L.Ed.2d 820 (2001); *Bd. of Trs. of Pub. Employees' Ret. Fund v. Hill,* 472 N.E.2d 204, 206 (Ind. 1985) (judicial pension); *Chairman of Bd. of Trs. of Employees' Ret. Sys. v. Waldron,* 285 Md. 175, 401 A.2d 172, 173–75 (1979)

---

1. H.E.A. 1856, 112th Gen. Assem., 1st Reg. Sess. (Ind.2001).

(judicial pension); *Nellius v. Stiftel,* 402 A.2d 359, 361–62 (Del.1978) (judicial salary); *Schwab v. Ariyoshi,* 57 Haw. 348, 555 P.2d 1329, 1331 (1976) (judicial salary). Despite our view that this legislation is important to the State, we cannot simply decree our own policies. Rather, we are obliged to address this claim, like any other, based on our best assessment of the applicable law. We conclude that we must sustain the Governor's veto.

### Factual Background

The relevant facts are few and simply stated. On April 29, 2001, the House passed House Enrolled Act 1866 in the form previously passed by the Senate after it was recommended by a Conference Committee composed of members of both houses. The General Assembly adjourned that day. The Clerk of the House of Representatives presented the bill to Governor O'Bannon on May 4, 2001. Seven days later, on May 11, the Governor vetoed and delivered the bill to the House. His veto and veto message were reported in the House and Senate Journals on that date. The House was not in session on May 11 and first reconvened on November 20, 2001, the "Organization Day" for the 2002 session. The initial meeting day of the 2002 session was January 7, 2002. On March 14, 2002, the House voted 85–1 to sustain the Governor's veto.

Article V, Section 14 of the Indiana Constitution reads in relevant part:

> (a) Every bill which shall have passed the General Assembly shall be presented to the Governor. The Governor shall have seven days after the day of presentment to act upon such bill as follows:

---

**2.** Various treatises substitute "does not regard," "is not concerned with," and "cares not for" for our choice of "does not redress"

---

\* \* \*

> (2) He may veto it:

\* \* \*

> (D) In the event of a veto after final adjournment of a session of the General Assembly, such bill shall be returned by the Governor to the House in which it originated on the first day that the General Assembly is in session after such adjournment.... If such bill is not so returned, it shall be a law notwithstanding such veto.

Ind. Const. Art. V, § 14(a)(2)(D).

### I. Plaintiffs Cite No Cognizable Harm

At some point in the prehistory of the common law, courts formulated the eminently practical doctrine now sometimes colloquially referred to as *"de minimis"* but formally stated as *"de minimis non curat lex."* Freely translated from the Latin, it proclaims that the law does not redress trifles.[2] In contemporary American vernacular, it is the courts' way of saying "So what?" If there is no "what," the courts do not provide relief to ordinary litigants and certainly do not interfere with the operations of the other branches of government. This doctrine is relevant here. Plaintiffs cite no practical consequences of the Governor's delivery of the vetoed bill before the first day the legislature reconvened, rather than on that date. And it is obvious there were none. The bill was "returned" and ready for legislative action at the first moment the General Assembly could consider it. No wheel of the machinery of government was slowed and no change in the bill's status was effected by its delivery on May 11 rather than on November 20. To the extent there was any effect of the allegedly pre-

---

which is less literal, but we think more to the point.

mature delivery, it was to expand by a few hours on November 20 the time the legislature had to consider the matter. In short, there is no substance to the Plaintiffs' claim.

The *de minimis* doctrine is closely related to the idea of substantial performance, which teaches that minor irregularities that do not affect the finished product do not provide the basis for a lawsuit. Max L. Veech & Charles R. Moon, *De Minimis Non Curat Lex*, 45 Mich. L.Rev. 537, 549 (1947). One may view these doctrines as denying legal intervention where no significant injury is inflicted, at least for unintentional wrongs, or as denying legal intervention where the process complained of is out of specification but in the end produces the same result that would have emerged from strict conformance. *Hessel v. O'Hearn*, 977 F.2d 299, 303–04 (7th Cir. 1992). Plaintiffs' complaint about the Governor's veto in this case suffers from both defects. No harm whatsoever was inflicted on the legislative process. And deliv-

ery before rather than "on" the first day achieved everything necessary for the process to work.

Plaintiffs make much of the fact that the language on which they rely is found in the Indiana Constitution. But common sense has driven our constitution from the earliest time.[3] It was the order of the day in 1816 and 1851 when that document was framed, and in 1970 when it was amended to include the provision at issue here. The *de minimis* maxim was early developed as a tool for the interpretation of documents. As one leading authority put it, "it is a rule of reason, a substantive rule that may be applied in all courts and to all types of issues." Veech & Moon, *supra*, at 542. The Supreme Court of the United States explained that the doctrine "is part of the established background of legal principles against which all enactments are adopted, and which all enactments are deemed to accept." *Wis. Dep't of Revenue v. William Wrigley, Jr., Co.*, 505 U.S. 214, 231, 112 S.Ct. 2447, 120 L.Ed.2d 174 (1992).[4] Thus,

---

3. The 1816 Constitution "emphasized a set of broad principles rather than technical specifics that the drafters ... felt the organic act should include." William P. McLauchlan, *The Indiana State Constitution: A Reference Guide* 2 (1996). "The frontier democrats who dominated the first Constitutional Convention countered the risk that reactionary elements might fashion a non-majoritarian government by adopting measures to guarantee popular participation and protect scrutiny of public affairs." *Price v. State*, 622 N.E.2d 954, 961–62 (Ind.1993). The delegates borrowed from other state constitutions, but "they generally borrowed only those features which promoted political inclusion, eschewing the elitist provisions favored by territorial federalists...." *Id.* at 962 n. 10. In 1850, when the constitution was revised, again "populist, anti-government Jacksonian Democrats" largely dominated the revisions. *Id.* at 962. As documented in Part II, the 1970 amendments were designed to address several abuses, notably the "pocket veto," that had arisen from the literal compliance with the requirements for a veto in the 1851 Constitution.

4. For this proposition, the Supreme Court cited cases from a variety of contexts: *Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 618, 112 S.Ct. 2160, 119 L.Ed.2d 394 (1992) (*de minimis* effects in the United States would not confer jurisdiction under the Foreign Sovereign Immunities Act of 1706, 28 U.S.C. § 1602 *et seq.*, calling for an exception to immunity when the effect is a direct and foreseeable result in this country); *Hudson v. McMillian*, 503 U.S. 1, 9–10, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992) (intentionally inflicted minor injuries may be *de minimis* violations of the Eight Amendment); *Ingraham v. Wright*, 430 U.S. 651, 674, 97 S.Ct. 1401, 51 L.Ed.2d 711 (1977) (minor restraints of liberty do not violate the Fourteenth Amendment); *Abbott Labs. v. Portland Retail Druggists Ass'n*, 425 U.S. 1, 18, 96 S.Ct. 1305, 47 L.Ed.2d 537 (1976) (occasional sales at lower prices in emergency situations do not establish a violation of the Robinson–Patman Act); *Indus. Ass'n of San Francisco v. United States*, 268 U.S. 64, 84, 45 S.Ct. 403, 69 L.Ed. 849 (1925) ("few and widely separated instances"

"from the earliest Roman times" it has invariably been the case, "[w]hether the court be applying a constitutional, statutory or common law rule of law, it has felt empowered to interpret that rule with the aid of *de minimis non curat lex.*" Veech & Moon, *supra,* at 543. The doctrine was well recognized before Indiana became a state. *Ware v. Hylton,* 3 U.S. (Dall.) 199, 268, 1 L.Ed. 568 (1796) ("*De minimis non curat lex,* is an old law maxim."); *Hill's Lessee v. West,* 4 Yeates 142, 156 (Pa. 1804); *Roberts v. Todd,* 2 Ky. (Sneed) 187 (1802). And James Madison early invoked it as to constitutional issues: "the best that can now be done, may be to apply to the Constn. the maxim of the law, de minimis non curat." Letter from James Madison to Edward Livingston (July 10, 1822), *reprinted in* 5 *The Founders' Constitution* 105 (Philip B. Kurland & Ralph Lerner eds.,1987).

In applying the maxim, by far the most significant factor is the purpose behind the phrase to be interpreted. Veech & Moon, *supra,* at 545. This was recognized by then Chief Justice Holmes of the Massachusetts Supreme Court in ruling on a challenge to the use of voting machines based on the explicit requirement in the Massachusetts Constitution that representatives be chosen by "written vote." *In re House Bill No. 1291,* 178 Mass. 605, 60 N.E. 129, 130 (1901). Over a century ago, this common sense approach prevailed over formalism. Election by voting machines was constitutional because the machines served the purpose and form of written votes, though not literally compliant. *Id.* Similarly, the Supreme Court of Nebraska upheld constitutional amendments even though the procedures used to enact the amendments did not follow the letter of the state constitutional requirement that proposed constitutional amendment be published regularly in newspapers. *State ex rel. Thompson v. Winnett,* 78 Neb. 379, 110 N.W. 1113, 1115–17 (1907). Because there was substantial compliance with the constitution, albeit incomplete compliance, the Supreme Court of Nebraska upheld the amendments. *Id.* at 1116.

Here we think it obvious, for the reasons explained in detail in Part II, that the purpose of the language at issue here is to assure that the legislature have the earliest possible opportunity to consider, and, if it so chooses, to override a veto. The Governor's veto message here fully met that objective, and no one has suggested any nefarious consequence arising from the procedure followed by the Governor in making clear his rejection of the bill. Section 14 is also designed to provide a bright line for the time to veto a bill, after which a returned veto is ineffective. The issue is not what "on" a given date means. We agree that the constitution sets a bright line and requires that the governor deliver the veto by that date or forego the privilege. Rather, the issue is what it means to say that the bill is or is not "returned" on that date. For the reasons explained in Part II, we think a veto message delivered before the legislature reconvenes is "returned" on that date. We think no one would argue that a statute of limitations requiring a suit to be filed "on" a given date would bar a claim filed before that date. Just as a suit filed before a specified date is "filed on" that date, so also was the Governor's veto "returned on" the first day of the legislative session. In short, the constitution surely provides a bright line for governors to execute their veto power. The issue is whether that line is a deadline or a point in time.

of interference with sales did not establish a

conspiracy to restrain trade).

Long ago, modern observers recognized as a "vice of the law" its "tendency to attribute undue importance to form as opposed to substance, and to exalt the immaterial to the level of the material." Salmond, *Jurisprudence* § 10, at 25 (6th ed.1920). Plaintiffs' theory in this case takes that vice to new pinnacles and disregards the many practical and sound cases from this Court and others recognizing that immaterial variances from prescribed procedures have no legal fallout. *See, e.g., Ind. State Highway Comm'n v. Morris*, 528 N.E.2d 468, 470–71 (Ind.1988) (plaintiff who sent notice of claim to the State Highway Commission but not to the Attorney General as required by the Tort Claims Act substantially complied with the statute); *Porter v. State*, 271 Ind. 180, 200–01, 391 N.E.2d 801, 816 (1979) (minor irregularities in jury selection did not constitute reversible error where there had been substantial compliance with the statute), *overruled on other grounds, Fleener v. State*, 274 Ind. 473, 412 N.E.2d 778 (1980). In fact, as explained in Part II.E, Plaintiffs' proposed reading of the constitution not only solves no problems; it raises new ones. Because the Governor's veto substantially conformed to the constitutionally prescribed process, the veto was properly returned to the legislature. Because the House of Representatives then sustained the veto by a vote of 85–1, the bill did not become law.

## II. The Constitution Was Not Violated

### A. *The Meaning of "Is Not So Returned" in Section 14*

Plaintiffs argue that Section 14 is unambiguous. The constitution says that if a bill "is not so returned" by the governor "on" the first day of the next session, it becomes law. Thus, to veto a bill after the General Assembly has adjourned, the bill must be "returned" on that date.[5] The constitution also says that if a bill "is not so returned" it "shall become law." Plaintiffs contend the meaning of this constitutional provision is clear and unequivocal and therefore its plain meaning must be given effect. Plaintiffs further argue that the governor's veto power "'must be strictly construed'" because it is a "'restriction upon the legislative branch of the government and is in derogation of the general plan of government for the separation of powers.'" (Br. of Appellants at 10 (quoting *Hendricks v. State ex rel. N.W. Ind. Crime Comm'n, Inc.*, 245 Ind. 43, 52, 196 N.E.2d 66, 70 (1964)).)

We do not agree that the provision is as clear as Plaintiffs contend. Plaintiffs, quoting *Webster's Collegiate Dictionary* 990 (1977), argue that "return" should be given its ordinary meaning, and that is "to send back." The State responds that there is an ambiguity in Section 14 that derives solely from its text, and if vetoed bills must be "returned" on the first day, that is what occurred here. As the Governor puts it, the "physical return of the veto allowed the 'return' to be accomplished (completed) on the first day of the next session. It is undisputed that the vetoed bill, with the Governor's objections, was physically present on the first day of the next session in the house of origin as required by Art. V, § 14." (Pet. to Transfer at 5.) As the Governor argues, if a veto is returned before a given date, in one sense it remains returned at all times after that. This nicety turns on whether "is returned" is a verb (the equivalent of "to be re-

---

5. Plaintiffs also contend that when there is doubt as to a law's enactment, it is resolved in favor of enactment. The 1972 amendment "reflects this pro-enactment perspective" because whenever the Governor fails to act, the bill becomes law. (Br. of Appellants at 11.)

We find no authority for this contention, and we do not see Section 14 as biased in favor of either the legislature or the Governor if the two disagree. Rather, it seeks clarity as to the procedures to be used.

turned") or a description of its status (it shall be a returned bill on this date). In sum, although the Plaintiffs' reading of the text is certainly plausible, it is not the only permissible one.

The history of Section 14 also suggests that "shall be returned ... on the first day" and "is not so returned" are not as clear as Plaintiffs claim. Section 14 was amended in 1972 to address a number of problems in the 1851 constitutional provision for the veto of legislative bills. Before the 1972 amendment, Section 14 provided that a bill became law unless the governor vetoed and returned it to the house of origin within three days of its presentment. If the General Assembly was adjourned, the governor was to file the bill and his veto with the Secretary of State, who would then return it to the assembly "at its next session." The 1851 provision prohibited the presentment of bills within two days of the General Assembly's final adjournment. The principal concern over these provisions arose from the practice of the "pocket veto" that had developed over time. In several cases, a governor had simply done nothing with a bill passed shortly before a recess or adjournment. The result was to stymie the constitutional process by preventing the Secretary of State from presenting the bill to the legislature. On the last day of 1968, the Court of Appeals held this practice invalid, but expressly stated that its holding would not apply retroactively to earlier legislation. *State ex rel. Mass Transp. Auth. of Greater Indianapolis v. Ind. Revenue Bd.*, 144 Ind.App. 63, 73, 242 N.E.2d 642, 648 (1968). The result was that the pocket veto in that case failed and any future attempts by governors to pocket veto bills would be unsuccessful. This Court, by a 2–2 vote, denied transfer. *State ex rel. Mass Transp. Auth. of Greater Indianapolis v. Ind. Revenue Bd.*, 251 Ind. 607, 244 N.E.2d 111 (1969). As a result of that case, Section 14 became a focus of attention. The current version became part of the constitution in 1972, with immaterial changes in 1990. It was designed to deal with several issues in the veto process. Specifically, the amendment was designed to abolish the "pocket veto" by imposing a short deadline for the governor to act.[6] To do this, the amendment extended the time for post-adjournment veto from five to seven days, required a vetoed bill to be returned to the legislature by the governor rather than the Secretary of State, and required that the bill be returned on the first day of the legislature's next session rather than at some indefinite time "at its next session." If these steps are not taken, the constitution provides that the bill becomes law.

This constitutional provision was first passed by the 1969 General Assembly and was approved by the voters in 1972. In 1969, when the language was drafted, the Indiana constitutional provision dealing with gubernatorial vetoes was, as today, in Art. V, Section 14. It provided:

> There would have been no need for the *Mass Transportation* decision had it been clear before 1968 that Section 14 did not allow pocket vetoes. As the 1970 Constitutional Revision Commission Report noted, "the amendment resulted from a judicial decision nullifying the use of the pocket veto (in the Mass Transportation Authority case)." Ind. Legislative Council, *Report of the Constitutional Revision Commission* 10 (1970).

---

**6.** Plaintiffs' principal brief asserts that the purpose of the 1972 amendment could not have been to stop the practice of pocket vetoes, as the State contends, because Section 14 already prohibited them. They apparently abandon that contention on transfer to this Court. In any event, their contention that *"Mass Transportation* ... plainly shows such vetoes were prohibited by the *pre*-1972 amendment version of article V, section 14,"* (Br. of Appellants at 13), misses the mark.

If any bill shall not be returned by the governor within three days (Sundays excepted) after it shall have been presented to him, it shall be a law, without his signature, *unless the general adjournment shall prevent its return;* in which case it shall be a law, unless the governor, within five days next after such adjournment, shall file such bill, with his objections thereto, in the office of the secretary of state; who shall lay the same before the general assembly, at its next session, in like manner as if it has been returned by the governor. But no bill shall be presented to the governor within two days next previous to the final adjournment of the general assembly.

Ind.Code Ann. Const. Art V, § 14 (West 1999) (Historical Notes) (emphasis added).

As the italicized phrase shows, the constitution itself assumed that if the General Assembly was not in session, that circumstance "prevented" the governor from "returning" a veto. The reason adjournment "prevented" a "return" is found in the history of the operation of the legislature. In 1969, there was far less permanent staff of the sort that had become common by the 1980s. Justin E. Walsh, *The Centennial History of the Indiana General Assembly, 1816–1978,* at 533–35, 607–08 (1987). The Legislative Sessions and Procedures law, Ind.Code § 2–2.1–1 (1998), was first passed in 1971, and the Legislative Council was first created in 1967, Ind. Code Ann. § 2–5–1.1–1 (West 2000) (Historical and Statutory Notes). Indeed, there was no Legislative Services Agency until 1978. Ind.Code Ann. § 2–5–1.1–7 (West 2000) (Historical and Statutory Notes). In 1971, pursuant to a constitutional amendment approved by the voters in 1970 allowing the General Assembly to fix the length and frequency of its sessions, the General Assembly first began meeting annually rather than in the biennial sessions called for by the 1851 Constitution. Ind. Const. Art. IV, § 9; Ind.Code §§ 2–2.1–1–2, –3 (West 2000) (Historical and Statutory Notes); Ind. Chamber of Commerce, *Here Is Your Indiana Government 1997–1998,* at 28–29, 53 (28th ed.1997). At the same time, the Legislative Services Agency assumed a greater role and the legislature provided for a year-round staff. Walsh, *supra.* This change is reflected in both the House and Senate Standing Rules and Orders of 1969 and 1971. In 1969, neither body's Rules and Orders mention the possibility of filing bills before session, but in 1971 both provide for that possibility. All of these changes occurred, however, after the amendment to Section 14 was drafted and first passed by the 1969 legislative session.

In light of this history, and the practices of the day at the time Section 14 was written, we think it clear that the 1851 provision for gubernatorial veto, still in effect in 1969, reflected an assumption of a citizen legislature that did not meet in the even-numbered years and truly disbanded to return to everyday life in the twenty months between the biennial sessions called for in Article IV, Section 9 as it read from 1851 until 1970. The concept of "session day" had been adopted in recognition of the reality that the legislature could not conduct its affairs in sixty-one calendar days, and interim recesses were prevalent in addition to adjournment until the next session. Under this regime, if neither branch was in session, the assumption of the drafters of the 1851 Constitution and the mindset of the 1969 legislature was that the General Assembly was not in business. As a result, there was no one to whom the governor could "return" a vetoed bill. The provision in Section 14 that the bill be "returned on" the first day of the next session was seen as requiring that it be "returned" at the earliest possible

date that a return could be accomplished. Under current legislative procedures there is of course a window of time between the adjournment and the first day of the next session when the legislative staff is open for business and a physical delivery is possible. But at the time it was written, Section 14 was seen as both setting a deadline and requiring that the vetoed bill be available at the earliest possible date to allow the legislature to override it. Plaintiffs make the point that the constitutional framers have chosen their words carefully. When they intend an event to occur on a specific date, they use the word "on," and when they intend to create a deadline, they use the words "by" or "before." Given the practice at the time, however, the language that Plaintiffs contend is unambiguous is in fact quite unclear as to its intended result, if, as was not thought possible in 1969, a bill was physically delivered before a new session was convened.

B. *The Practice of the Executive and Legislative Branches Under Section 14*

The clarity Plaintiffs claim is called into question by at least two decades of practice by both governors and the legislature. The State argues that the Governor and General Assembly's actions indicate their understanding of the constitution and reflect the practice of at least three governors and the legislature dating at least to 1982. In addition to the pay bill discussed above, a variety of other laws are claimed to have been vetoed by the same process and could be resuscitated by the Plaintiffs' success here.[7] Plaintiffs respond, and we agree, that past practice of the governor and the General Assembly cannot validate an unconstitutional process. They note that *Mass Transportation* so held in condemning the "pocket veto" that was the subject of that case. The pocket veto, however, involved a practice that arguably directly contravened the constitutional requirement that the governor face the veto issue and take responsibility for it by signing a veto and returning the bill. Accountability and visibility of the governor's torpedo are plainly legitimate objectives of the framers. Here we have an entirely different issue. We are faced with interpretation of a provision that is susceptible to different readings. No one advances any policy that was frustrated by the practice of physical delivery during adjournment, producing a bill that "is returned" at all times after delivery, including on the first day of the next session. The actions of both governors and the General Assembly, rather than "flouting" the constitution, may be taken simply to evidence their understanding of the constitutional requirement over some two decades, with no suggestion from either branch or by any court that the practice was questionable.[8]

---

**7.** According to the Senate and House Journals, in 82 instances since 1981, the veto message appeared to have been returned in the window of time after adjournment and before the ensuing session. We have not researched earlier periods and we have not examined the underlying documentation. The bills and relevant Senate and House Journal entries are listed in Appendix A.

**8.** Plaintiffs also argue that allowing the "early return" of bills "would frustrate the purposes of Indiana law requiring the House and Senate to maintain public journals of all action on legislation." (Br. of Appellants at 16.) Plaintiffs rely on the doctrine that "the contents of such journals are dispositive as to legislative events," and suggest that in the absence of a record showing the Governor's veto and its return on the first day of the General Assembly's next session, that it did not occur. (*Id.* at 16–17.) The Governor's veto was in fact recorded in the House Journal. Indiana House Journal at 1329 (2001) ("Messages After Adjournment"). Thus, this argument has no merit.

Both sides cite the practice of prior governors and legislatures as an aid to the construction of Section 14. The Governor and the Attorney General argue that past veto messages show a consistent pattern that reflects the understanding of governors and legislators over at least twenty years that the procedure followed with respect to House Enrolled Act 1866 conformed to the constitution. In all of these cases, the "Messages After Adjournment" section of the journals reflects veto messages, and in most cases the message bears a date within ten days after adjournment and before the next session. A few are undated. The fact that the messages appear in the "Messages After Adjournment" section of the old session, rather than in the journal for the new session, suggests that the messages were indeed received by the legislature before the new session convened, but this is merely an inference. Similarly, some of these messages stated that the governor was "vetoing" and "returning" the bill on the date of the message, which also suggests delivery

on that date. But, that also is inconclusive as to the timing of delivery of the vetoes. In other cases, the message stated simply that "I have vetoed" the bill, and said nothing about its delivery.[9]

Plaintiffs point out that in some instances the veto message appears in the journal for the first day of the ensuing session, and contend that this shows the legislature received some messages on the first day of reconvening. From this, they argue that there has been no consistent practice of delivering veto messages before the first day of the following session. This argument seems to proceed from a fallacious premise. The journal entries of veto messages in the ensuing session in most cases appear on the date of the override vote, not the date the governor delivered the veto message. The entries do not purport to establish that the messages were delivered on the first day, and it is clear that in many cases the entries were not the date of delivery.[10] It is true that in the instanc-

9. The veto message for House Enrolled Act 1866 at issue in this case was dated May 11, 2001, and read: "I hereby veto House Enrolled Act 1866 and return it to the House of Representatives for further action." Indiana House Journal at 1330 (2001). In some cases, the veto message, dated in that window of time, read, for example: "I return herewith House Enrolled Act 1729, which I have vetoed this 6th day of April, 1983." Indiana House Journal at 875 (1983). In others, the message, also so dated, read: "I hereby veto Senate Enrolled Act 116 and return it herewith...." Indiana Senate Journal at 537 (1992).

10. For example, in the case of Senate Bill 239, Governor Orr's 1981 message read: "I return herewith Senate Bill 239, which I have vetoed this 5th day of May, 1981." Indiana Senate Journal at 850 (1981). That message appears in both the "Messages After Adjournment" section of the 1981 session and the Senate Journal for the date on which override was considered, which was February 15, 1982, the twentieth, not the first, day of the

following session. Indiana Senate Journal at 353 (1982). But because the bill was not considered on the first day, the message does not appear on that date. The inference seems clear that the bill was in fact received by the legislature some time on or before the first day, and a fair reading of Governor Orr's message is that it was delivered on "this 5th day of May, 1981," long before the next session convened. For an example of a similar entry in Governor Bayh's administration, see House Journal for March 8, 1990 (the 29th day), where the veto message for House Enrolled Act 1930, dated May 10, 1989, appears. Indiana House Journal at 670 (1990). Journal entries in Governor Bowen's administration, unlike those in later years, are accompanied by a "Statement" from the Secretary of the Senate that the vetoed bills "have been returned to the Senate and received by me." The statement is filed as an entry for the first session day, but is undated and does not say when the "return" or "receipt" occurred, only that it happened at some time ("have been") before the statement. *See, e.g.,*

es the Plaintiffs cite the veto message appears on the first day. But in almost all of those cases, the first day was also the day the bill was subject to an override vote.

The veto messages appear in various formulations. Although it is clear from the journal entries when the governor signed each message, and some recite that the return is concurrent with the veto, we are directed to no independent evidence of the date on which the message was delivered to the legislature. As a result, although it is clear that a substantial number of these bills, and perhaps all, were vetoed by the procedure used to veto House Enrolled Act 1866, in several instances we are unable to determine with confidence whether the veto is or is not in that category, and in some it seems likely the bills were delivered on the first day. Nevertheless, it is clear that for many years, beginning within a decade of the effective date of the current Section 14, at least some vetoes were delivered before the next session without objection by the legislature.

The State contends that this history demonstrates that the practice of delivery before the first day is consistent with the constitution. There is certainly support for the view that legislative or executive practice can build a patina on the constitutional framework. `Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 610–11, 72 S.Ct. 863, 96 L.Ed. 1153 (1952) ("[A] systematic, unbroken, executive practice, long pursued to the knowledge of Congress and never before questioned ... may be treated as a gloss on 'executive Power' vested in the President...."); *United States v. Midwest Oil Co.*, 236 U.S. 459, 474, 35 S.Ct. 309, 59 L.Ed. 673 (1915) (noting that a president's "long-continued practice, known to and acquiesced in by Congress" creates "a presumption" that the practice is a proper exercise of the president's power); *Lutz v. Arnold*, 208 Ind. 480, 508, 193 N.E. 840, 851 (1935) ("In determining whether the Legislature had the constitutional right to enact certain legislation, the Legislature's interpretation of its power is entitled to great weight, and especially where acquiesced in for a long period of time."). Regardless of whether the message was delivered before the first day in every case, the constant delivery of vetoes before the first day is a salient fact here and evidences approval of the practice over most of the life of current Section 14.

The State also notes that Section 14 was amended in 1990 without change in the language at issue here. For at least several years before 1990, governors had begun the practice of physical delivery of vetoed bills before the onset of a new session. *See* Appendix A. Though there may be no consistent practice of delivery "early" or waiting for the first day of session, either was deemed acceptable by the governor and acted upon by the General Assembly without protest. Amendment of a constitutional provision without change to eliminate current practice has been cited as one factor suggesting that the interpretation is permissible. *Ratliff v. Cohn*, 693 N.E.2d 530, 539–40 (Ind. 1998). Like prior practice, a subsequent amendment does not justify disregard of the constitution, but a subsequent amendment without change in language that has been construed in practice suggests satisfaction with the governors' and the Gener-

Indiana Senate Journal at 7 (1974). These are in contrast to earlier practice under the pre–1972 version of Section 14. At that time, the Secretary of State delivered the message transmitting the governor's veto and it appears to have been done on the opening day of the ensuing session. Indiana Senate Journal at 15 (1972).

al Assembly's view of how the provision applies. That is the case with Section 14.

## C. The "Legislative History" of the Amendment

We are directed to no helpful comments from the unknown author of Section 14 and no legislative history. In addition to relying on the text of Section 14, Plaintiffs direct us to a 1970 Report of the Constitutional Revision Commission prepared by the Legislative Council explaining the 1972 amendment. Plaintiffs point out that the Commission, in describing the amendment, stated that it "requires the Governor to return to the General Assembly on its first day in session a bill vetoed during a recess or adjournment ...." Ind. Legislative Council, *Report of the Constitutional Revision Commission* 10 (1970). The Court of Appeals relied heavily on this report for its conclusion that the "drafters" intended not merely to impose a deadline for vetoes, but also to require a return on a specific date. *D & M Healthcare, Inc. v. O'Bannon,* 793 N.E.2d 241, 245 (Ind.Ct.App.2003). On its face, the text of the Report would appear to suggest the view that the 1972 Amendment to Section 14 was intended to provide a specific date, not a deadline, for the return of a veto. The Report did not address the issue whether physical delivery before the first day created a "returned" bill. The quoted phrase is simply a description of the amendment in the course of a discussion of the issue.

The Court of Appeals apparently accepted Plaintiffs' assertion that the Commission was the author of the constitutional language in question. But the Report does not have the status of an authoritative commentary on this constitutional amendment. Nor is it a report from the proposer of the revision to Section 14. The Commission's project to study the Indiana Constitution and recommend changes began in 1967 and the Commission ultimately recommended twenty constitutional amendments between 1967 and 1969. Report, *supra,* at 1. At the time the Commission submitted its 1970 report, the amendment to Section 14 had already been passed by the 1969 General Assembly, Indiana House Journal at 1980 (1969), and required passage by the General Assembly to be elected in November 1970 before it would be submitted to the voters in 1972 pursuant to Article XVI, Section 1 of the Constitution. In the 1970 Report that Plaintiffs cite, the amendment to Article V, Section 14 was expressly excluded from those identified as recommended by the Commission. The Commission specifically noted in its introduction to the 1970 Report that the 1969 General Assembly had already approved nine of the Commission's "proposals." In a footnote, the Commission added: "A tenth amendment, also approved, was submitted by an individual legislator and resulted from the court decision nullifying the use of the pocket veto. The ruling was issued after the Commission had concluded its report." *Report, supra,* at 1. This footnote plainly refers to the amendment that became current Section 14 and disclaims the Commission's parentage of it. If there were any doubt on this point, it is removed by a review of the 1969 Report, which was the Commission's first official document and lists a number of recommended amendments. None of these affected Section 14. *See* Constitutional Revision Comm'n, *Biennial Report to the Indiana General Assembly* 1–4 (1969). Thus, although the Report may approach the status of an official commentary on the Commission's recommendations for constitutional amendments pending at the time, the Commission's description of Section 14 is at most a contemporaneous account of the amendment to Section 14, which did not originate with the Commission.

Plaintiffs also cite a portion of the Report that described the question resolved by the then-pending amendment to Section 14 as:

> If the legislative sessions amendment [(then an amendment pending to prevent recesses during session)] is approved, the General Assembly could schedule recesses of one week or more during the session. How would this affect the time limits? Should the Governor return vetoed legislation during a recess or wait until the first day in session?

*Report, supra,* at 11. Once again, the Commission did not address the effect of a delivery of a bill before the first day and did not directly answer the question it posed. Rather, it simply made clear that a bill "can be killed only through exercise of the veto." Report, *supra,* at 11. It did not address the mechanics of how a veto is delivered other than in its passing description of the amendment.

We think the Commission's observations on Section 14 are shaped by the same mindset that generated the choice of language for Section 14. The Commission's references to "recess" in context are to recesses "for a week or more" within a session, as well as to adjournment between sessions. Because the pre–1972 Constitution required the veto in three days from presentation, a recess during session would be problematic without the amendment to Section 14. The amendment was to make clear that a pocket veto would not be effective during a recess. In sum, the Commission's observations on the amendment to Section 14, which was not among its proposals, are little more than a recitation of the language of the then-pending amendment viewed through the lens of the then-current understanding of when a "return" could first be accomplished, and addressing issues different from the one presented here.

Finally, Plaintiffs cite a pamphlet given to voters describing the amendment to Section 14. The reason given for the amendment was that "No specific time of return is prescribed [in the 1851 Constitution], ... and it is unclear when it should be returned and, further, what the effect of failure to return such legislation would be; would it be killed or could it be acted upon at a later time, if returned?" Ind. Legislative Council, *Five Questions for Hoosier Voters* 10 (1972). Plaintiffs argue that this statement, along with the language of the amendment, told voters that the amendment was to set a date certain upon which a governor has to return a vetoed bill. But all this pamphlet says is that the amendment (1) sets a deadline for exercising the veto, and (2) makes clear that a governor could not veto by failing to return a bill as governors had in the past through the pocket veto. *Questions for Voters, supra,* at 9–11. It does not state that a governor must return a vetoed bill on a date certain.

### D. *The Function of Section 14*

Because the language of Section 14 does not clearly resolve the question before us, it is appropriate to look to the purpose of the provision to illuminate its meaning. This proposition applies to constitutional provisions as well as statutes. *Ind. Gaming Comm'n v. Moseley,* 643 N.E.2d 296, 298 (Ind.1994); *Eakin v. State ex rel. Capital Improvement Bd. of Managers of Marion County,* 474 N.E.2d 62, 64–65 (Ind.1985); *Tarlton v. Peggs,* 18 Ind. 24, 25 (1862) (construing Art. V, § 14); *State ex rel. Mass Transp. Auth. of Greater Indianapolis v. Ind. Revenue Bd.,* 144 Ind.App. 63, 71, 242 N.E.2d 642, 647 (1968) (same), *trans. denied.* Both sides argue that the purposes of Section 14 are furthered by

the construction they urge. All agree that one principal goal of the 1972 amendment was to provide a date certain by which the governor must act or a bill became law without his signature. The pocket veto was thus to become a relic of the past. And it seems equally clear that the Section was intended to require the governor to act on a timetable that permitted the legislature to respond to a veto during adjournment at the first opportunity, i.e., on the first day of the next session. But Plaintiffs identify no good reason why the constitution or its framers would wish to prohibit a physical delivery of a veto before it is due. The use of "returned on" simply reflects the then-current understanding that that date was not only the desired deadline, but also the first opportunity to complete a "return" of a bill to a branch of government that floated into and out of existence from time to time. So viewed, the returned status is accomplished only when the entity to whom return is required is present to receive it. This construction does no violence to the framers' objectives, is consistent with the text, gives due respect to views of the other branches, and is eminently practical.

### E. *Problems with the Plaintiffs' View*

To some it seems to defy common sense that major consequences attach to the Governor's having, as his counsel put it, "sent his homework in early." And, as explained in Part I, even if the veto was prematurely delivered, that would not invalidate the veto. Physical delivery before a bill is required to be "returned" contravenes no identified policy. But there are also practical consequences to the Plaintiffs' view that lead us to conclude that it cannot have been the intended result of the language chosen by the drafters of Section 14. The State points to the at best awkward and perhaps disastrous situations created by the Plaintiffs' proposed construction of Section 14. If a "return" cannot be effected until November, laws having passed in the spring at the end of a usual legislative session, which frequently purport to be in effect as of July 1, will be in an uncertain status for several months. Plaintiffs contend that uncertainty is inherent in the veto process because an override is possible. But the legislature has addressed the effective date of vetoed bills. A veto announced and physically delivered to the legislature before the effective date makes clear that the law will not be effective unless and until the veto is overridden. Ind.Code § 1–1–3.1–3(d) (1998); H.E.A. 1866 § 22, 112th Gen. Assem., 1st Reg. Sess. (Ind.2001). By contrast, if the Plaintiffs are correct and a veto cannot be completed until the next session, the effective date of many bills will pass before that time. Anyone affected by the law would be left in a period of several months of uncertainty as to the lawfulness of actions taken in the interim period between the law's purported effective date and the first day of the next session.

### Conclusion

We agree that the Plaintiffs' literal reading of Section 14 is permissible and perhaps even persuasive if taken in isolation. But there remains ambiguity in the language of Section 14. Both the legislative and executive branches have treated numerous interim vetoes as effective as long as they were delivered before the next session. We see no practical reason for the construction the Plaintiffs urge, and significant disadvantages to it. We conclude that Section 14 places a deadline for physical delivery, but permits that to be done at any time, so long as the result is a returned veto on the first day of the next session. Accordingly, we hold that the Governor's veto of House Enrolled Act 1866 was valid. Because the House then

sustained the veto, the bill did not become law. The Plaintiffs requested that the trial court enjoin the implementation and enforcement of the rules adopted by FSSA as conflicting with House Enrolled Act 1866. Because we conclude that House Enrolled Act 1866 did not become law, the rules are not subject to the flaw on which the Plaintiffs rely. The judgment of the trial court is affirmed.

DICKSON and RUCKER, JJ., concur, and SHEPARD, C.J., concurs with separate opinion.

SULLIVAN, J., is not participating.

### Appendix A

In every case, the veto message appears first in the "Messages After Adjournment" section of the preceding legislative session. In most instances, the veto message is accompanied by a date; where it is not and a date for the veto is found elsewhere, that is listed in parentheses under the veto message date. Indices for each session are reproduced in a separate volume from the journals, but each journal also contains an index. In some cases, neither of the indices reflects action on the vetoed bill. Where action is shown, except as noted below, the veto message appears in the journal of the next session on the date of the vote to sustain or override the veto. Where the vote was to override the Governor's veto, that is indicated by (O) and the listing of the two dates on which both houses voted to override the Governor's veto. If one house voted to sustain the veto, there typically is no action by the other.

Despite the appearance of the constitutional mandate found in Article V, Section 14(a)(2)(D) ("The bill must be reconsidered and voted upon within the time set out in Clause (C)"; Clause (C) requires a vote "before the final adjournment of the next regular session"), in some cases the vote did not occur in the next session and perhaps never occurred.

**102nd Gen. Assem., 1st Reg. and Spec. Sess. (Ind.1981)**
Commenced Nov. 18, 1980
Adjourned Apr. 30, 1981
Spec. Sess. May 27 - 29, 1981

| Vetoed Bill | Veto Message Date | Veto Message in Journal for New Session |
|---|---|---|
| S.E.A. 1 | May 1, 1981 | Feb. 15, 1982 |
| H.E.A. 1579 | May 1, 1981 | Mar. 20, 1991 [1] |
| S.E.A. 485 | May 4, 1981 | Feb. 15, 1982 |
| S.E.A. 239 | May 5, 1981 | Feb. 15, 1982 |
| H.E.A. 1583 | May 6, 1981 | Mar. 20, 1991 [1] |

**102nd Gen. Assem., 2nd Reg. Sess. (Ind.1982)**
Commenced Nov. 17, 1981
Adjourned Feb. 20, 1982

| Vetoed Bill | Veto Message Date | Veto Message in Journal for New Session |
|---|---|---|
| S.E.A. 442 | Feb. 25, 1982 | Jan. 28, 1983 |
| H.E.A. 1353 | Feb. 25, 1982 | Mar. 20, 1991 [1] |
| S.E.A. 363 | Feb. 26, 1982 | Jan. 28, 1983 |
| S.E.A. 413 | Feb. 26, 1982 | Jan. 28, 1983 |

1. Although these bills were vetoed in 1981, the legislature did not act on them until 1991. On Mar. 20, 1991, the "Clerk identified seventeen House bills, dating back to 1981, which had passed the House and Senate, had been vetoed by the Governor and returned to the House but which had not been presented to the House for reconsideration, within the meaning of Article 5, Section 14 of the Constitution." Indiana House Journal at 649–56 (1991). The Speaker then handed down the seventeen bills for reconsideration and the House voted on them.

**103rd Gen. Assem., 1st Reg. and Spec. Sess. (Ind.1983)**
Commenced Nov. 16, 1982
Adjourned Apr. 15, 1983
Spec. Sess. Dec. 6 - 16, 1982

| Vetoed Bill | Veto Message Date | Veto Message in Journal for New Session |
| --- | --- | --- |
| S.E.A. 449 | Apr. 22, 1983 | Feb. 2, 1984 |
| H.E.A. 1595 | Apr. 22, 1983 | Mar. 20, 1991 [1] |

**103rd Gen. Assem., 2nd Reg. Sess. (Ind.1984)**
Commenced Nov. 22, 1983
Adjourned Mar. 1, 1984

| Vetoed Bill | Veto Message Date | Veto Message in Journal for New Session |
| --- | --- | --- |
| H.E.A. 1297 | Mar. 2, 1984 | Mar. 28, 1985 |

**104th Gen. Assem., 1st Reg. Sess. (Ind.1985)**
Commenced Nov. 20, 1984
Reconvened Jan. 7, 1995
Adjourned Apr. 15, 1985

| Vetoed Bill | Veto Message Date | Veto Message in Journal for New Session |
| --- | --- | --- |
| S.E.A. 316 [2] | | Feb. 5, 1986 |
| S.E.A. 417 [2] | | Feb. 21, 1986 |
| H.E.A. 1635 [2] | | Jan. 24, 1986; Feb. 5, 1986 (O) |
| H.E.A. 1681 [2] | | Mar. 5, 1986 |

**104th Gen. Assem., 2nd Reg. Sess. (Ind.1986)**
Commenced Nov. 19, 1985
Reconvened Jan. 7, 1986
Adjourned Mar. 5, 1986

| Vetoed Bill | Veto Message Date | Veto Message in Journal for New Session |
| --- | --- | --- |
| S.E.A. 384 | Mar. 6, 1986<br>(1986 House Journal at 559) | Feb. 17, 1987 |

**105th Gen. Assem., 1st Reg. and Spec. Sess. (Ind.1987)**
Commenced Nov. 18, 1986
Reconvened Jan. 6, 1987
Adjourned Apr. 29, 1987
Spec. Sess. Apr. 30, 1987 (one day)

| Vetoed Bill | Veto Message Date | Veto Message in Journal for New Session |
| --- | --- | --- |
| S.E.A. 375 | May 4, 1987<br>(1987 House Journal at 1073) | Feb. 19, 1988 |

**105th Gen. Assem., 2nd Reg. Sess. (Ind.1988)**
Commenced Nov. 17, 1987

**2.** In these instances, the governor's veto message is undated as it appears in the House and Senate Journals, although the messages were contained in a list of "Messages After Adjournment."

Reconvened Jan. 4, 1988
Adjourned Feb. 29, 1988

| Vetoed Bill | Veto Message Date | Veto Message in Journal for New Session |
|---|---|---|
| S.E.A. 170 | Mar. 2, 1988 (1988 House Journal at 645) | Feb. 23, 1989; Mar. 7, 1989 (O) |
| S.E.A. 139 | Mar. 7, 1988 (Same) | Feb. 23, 1989 |

### 106th Gen. Assem., 1st Reg. and Spec. Sess. (Ind.1989)
Commenced Nov. 22, 1988
Reconvened Jan. 4, 1989
Adjourned Apr. 29, 1989
Spec. Sess. May 2 - May 4, 1989

| Vetoed Bill | Veto Message Date | Veto Message in Journal for New Session |
|---|---|---|
| H.E.A. 1606 | May 5, 1989 | Mar. 20, 1991 [1] |
| S.E.A. 441 | May 6, 1989 | Jan. 18, 1990; Mar. 5, 1990 (O in Senate; Sust. in House) |
| S.E.A. 386 | May 6, 1989 | Mar. 8, 1990 |
| H.E.A. 1655 | May 6, 1989 | Mar. 20, 1991 [1] |
| H.E.A.1963 | May 6, 1989 | Mar. 20, 1991 [1] |
| H.E.A. 1870 | May 9, 1989 | Mar. 20, 1991 [1] |
| H.E.A. 1769 | May 10, 1989 | Mar. 20, 1991 [1] |
| H.E.A.1930 | May 10, 1989 | Mar. 8, 1990 |

### 106th Gen. Assem., 2nd Reg. Sess. (Ind.1990)
Commenced Nov. 21, 1989
Reconvened Jan. 3, 1990
Adjourned Mar. 13, 1990

| Vetoed Bill | Veto Message Date | Veto Message in Journal for New Session |
|---|---|---|
| S.E.A. 108 | Mar. 15, 1990 | Jan. 17, 1991; June 13, 1991 (O in Senate; Sust. in House) |
| H.E.A. 1355 | Mar. 20, 1990 | Nov. 20, 1990 (Both houses) (O) |
| H.E.A. 1373 | Mar. 20, 1990 | Mar. 20, 1991 |

### 107th Gen. Assem., 1st Reg. and Spec. Sess. (Ind.1991)
Commenced Nov. 20, 1990
Reconvened Jan. 7, 1991
Adjourned Apr. 30, 1991
Spec. Sess. May 13 - 23, 1991
Spec. Sess. May 23 - June 14, 1991

| Vetoed Bill | Veto Message Date | Veto Message in Journal for New Session |
|---|---|---|
| H.E.A. 1235 | May 1, 1991 | Action not found |

### 107th Gen. Assem., 2nd Reg. Sess. (Ind.1992)
Commenced Nov. 19, 1991
Reconvened Jan. 6, 1992
Adjourned Feb. 14, 1992

| Vetoed Bill | Veto Message Date | Veto Message in Journal for New Session |
|---|---|---|
| S.E.A. 116 | Feb. 21, 1992 | Jan. 22, 1993; Apr. 29, 1993 (O) |
| S.E.A. 76 | Feb. 28, 1992 | Jan. 22, 1993; Apr. 29, 1993 |

(O in Senate; Sust. in House)

## 108th Gen. Assem., 1st Reg. and Spec. Sess. (Ind.1993)
Commenced Nov. 17, 1992
Reconvened Jan. 5, 1993
Adjourned Apr. 29, 1993
Spec. Sess. June 9 30, 1993

| Vetoed Bill | Veto Message Date | Veto Message in Journal for New Session |
|---|---|---|
| H.E.A. 1804 | May 5, 1993 | Not acted on in 1994 (*See* 1994 Index at 178) |

## 109th Gen. Assem., 1st Reg. Sess. (Ind.1995)
Commenced Nov. 22, 1994
Reconvened Jan. 4, 1995
Adjourned Apr. 29, 1995

| Vetoed Bill | Veto Message Date | Veto Message in Journal for New Session |
|---|---|---|
| S.E.A. 443 | May 5, 1995 | Nov. 21, 1995 |
| H.E.A. 1766 | May 8, 1995 | Feb. 15, 1996; Feb. 21, 1996 (O) |
| S.E.A. 250 | May 10, 1995 | Nov. 21, 1995 |
| S.E.A. 360 | May 10, 1995 | Nov. 21, 1995; Jan. 30, 1996 (O) |
| S.E.A. 563 | May 10, 1995 | Nov. 21, 1995 |
| H.E.A. 1152 | May 10, 1995 | Jan. 25, 1996; Feb. 29, 1996 (O in House; Sust. in Senate) |
| H.E.A. 1063 | May 12, 1995 | Action not found |

## 109th Gen. Assem., 2nd Reg. Sess. (Ind.1996)
Commenced Nov. 21, 1995
Reconvened Jan. 8, 1996
Adjourned Mar. 8, 1996

| Vetoed Bill | Veto Message Date | Veto Message in Journal for New Session |
|---|---|---|
| S.E.A. 269 | Mar. 12, 1996 | Jan. 16, 1997; Jan. 23, 1997 (O in Senate; Sust. by House) |
| H.E.A. 1299 | Mar. 14, 1996 | Jan. 21, 1997 |
| S.E.A. 106 | Mar. 19, 1996 | Feb. 11, 1997; Feb. 13, 1997 (O) |
| S.E.A. 234 | Mar. 21, 1996 | Feb. 13, 1997 |
| H.E.A. 1042 | Mar. 21, 1996 | Jan. 21, 1997; Jan. 30, 1997 (O) |
| H.E.A. 1280 | Mar. 21, 1996 | Jan. 21, 1997; Jan. 30, 1997 (O) |

## 110th Gen. Assem., 1st Reg. and Spec. Sess. (Ind.1997)
Commenced Nov. 19, 1996
Reconvened Jan. 7, 1997
Adjourned Apr. 29, 1997
Spec. Sess. May 14 - 29, 1997

| Vetoed Bill | Veto Message Date | Veto Message in Journal for New Session |
|---|---|---|
| H.E.A. 1160 [3] | May 12, 1997 (1997 House Journal at 3ss) | Jan. 12, 1998; Jan. 22, 1998 (O) |

**3.** These veto messages were recorded twice once on the first day of the following special session and once in the next legislative session on the listed date where a vote was then taken to sustain or override the governor's veto.

| | | |
|---|---|---|
| H.E.A. 1177 [3] | May 2, 1997 | Jan. 12, 1998 |
| | (Same at 2ss) | |
| H.E.A. 1583 [3] | May 13, 1997 | Feb. 17, 1998 |
| | (Same at 3ss) | |
| H.E.A.1845 [3] | May 13, 1997 | Jan. 12, 1998 |
| | (Same at 3ss) | |

(These four bills are not listed in the House "Messages After Adjournment" but are listed in the 1996 Senate Journal "Messages After Adjournment.")

### 110th Gen. Assem., 2nd Reg. Sess. (Ind.1998)
Commenced Nov. 18, 1997
Reconvened Jan. 6, 1998
Adjourned Feb. 27, 1998

| Vetoed Bill | Veto Message Date | Veto Message in Journal for New Session |
|---|---|---|
| S.E.A. 185 | Mar. 13, 1998 | Apr. 6, 1999 |
| | (1999 Index at 283) | |
| H.E.A. 1136 | Mar. 13, 1998 | Jan. 14, 1999; Jan. 21, 1999 (O) |

### 111th Gen. Assem., 1st Reg. Sess. (Ind.1999)
Commenced Nov. 17, 1998
Reconvened Jan. 6, 1999
Adjourned Apr. 29, 1999

| Vetoed Bill | Veto Message Date | Veto Message in Journal for New Session |
|---|---|---|
| S.E.A. 343 | May 13, 1999 | Mar. 2, 2000 |

### 111th Gen. Assem., 2nd Reg. Sess. (Ind.2000)
Commenced Nov. 16, 1999
Reconvened Jan. 10, 2000
Adjourned Mar. 3, 2000

| Vetoed Bill | Veto Message Date | Veto Message in Journal for New Session |
|---|---|---|
| H.E.A. 1231 | Mar. 7, 2000 | Action not found |
| S.E.A. 442 | Mar. 15, 2000 | Feb. 8, 2001 (O); House action not found |
| S.E.A. 408 | Mar. 15, 2000 | Feb. 19, 2001 (O); House action not found |
| H.E.A. 1397 | Mar. 15, 2000 | Action not found |
| H.E.A. 1278 | Mar. 15, 2000 | Action not found |
| H.E.A. 1214 | Mar. 15, 2000 | Action not found |
| H.E.A. 1150 | Mar. 15, 2000 | Jan. 16, 2001; Jan. 23, 2001 (O) |
| H.E.A. 1130 | Mar. 15, 2000 | Action not found |
| H.E.A. 1124 | Mar. 15, 2000 | Action not found |
| H.E.A. 1102 | Mar. 15, 2000 | Action not found |
| H.E.A. 1073 | Mar. 15, 2000 | Action not found |

### 112th Gen. Assem., 1st Reg. Sess. (Ind.2001)
Commenced Nov. 21, 2000
Reconvened Jan. 8, 2001
Adjourned Apr. 29, 2001

| Vetoed Bill | Veto Message Date | Veto Message in Journal for New Session |
|---|---|---|
| H.E.A. 1207 | May 3, 2001 | Mar. 13, 2002; Mar. 14, 2002 (O) |
| H.E.A. 1599 | May 3, 2001 | Mar. 14, 2002 (Both houses) (O) |
| H.E.A.1908 | May 3, 2001 | Mar. 13, 2002; Mar. 14, 2002 (O) |

| | | |
|---|---|---|
| H.E.A. 1083 | May 10, 2001 | Mar. 13, 2002 |
| S.E.A. 308 | May 11, 2001 | Mar. 7, 2002; Mar. 14, 2002 (O by Senate; Sust. by House) |
| S.E.A. 337 | May 11, 2001 | Nov. 20, 2001; Mar. 13, 2002 (O by Senate; Sust. by House) |
| S.E.A. 373 | May 11, 2001 | Nov. 20, 2001; Mar. 13, 2002 (O) |
| S.E.A. 471 | May 11, 2001 | Mar. 7, 2002; Mar. 14, 2002 (O by Senate; Sust. by House) |
| H.E.A.2001 | May 11, 2001 | Mar. 13, 2002; Mar. 14, 2002 (O by House; Sust. by Senate) |

**112th Gen. Assem., 2nd Reg. and Spec. Sess. (Ind.2002)**
Commenced Nov. 20, 2001
Reconvened Jan. 7, 2002
Adjourned Mar. 14, 2002
Spec. Sess. May 14 - June 2, 2002

| Vetoed Bill | Veto Message Date | Veto Message in Journal for New Session |
|---|---|---|
| S.E.A. 233 | Mar. 20, 2002 | May 14, 2002 (O); (No action by House, *see* 2003 Index at 314) |
| S.E.A. 459 | Mar. 20, 2002 | May 14, 2002 (O) (Same) |
| H.E.A. 1083[4] | Mar. 21, 2002 | (Same) |
| H.E.A. 1202[4] | Mar. 21, 2002 | (Same) |
| S.E.A. 152 | Mar. 27, 2002 | May 14, 2002 (O) (Same) |
| S.E.A. 19 | Mar. 28, 2002 | May 14, 2002 (O) (Same) |
| S.E.A. 154 | Mar. 28, 2002 | May 14, 2002 (O) (Same) |
| S.E.A. 217 | Mar. 28, 2002 | May 14, 2002; June 22, 2002 (O) |
| S.E.A. 506 | Mar. 28, 2002 | May 14, 2002 |
| H.E.A. 1065[3] | Mar. 28, 2002 | June 22, 2002; June 23, 2002 (O) |
| H.E.A. 1258[4] | Mar. 28, 2002 | (Same) |

SHEPARD, Chief Justice, concurring.

Connected as it is to the vetoed pay bill, this appeal has been a painful experience. Judges and prosecutors and their families have now gone seven years without so much as a cost-of-living adjustment, even as social workers, teachers, university professors, prison guards, and state employees generally have received several such adjustments. This differential treatment has been ruinous to the state's judiciary. Passing through the cloud of this calamity to decide this appeal on the basis of our best judgment about the law, however, is the job we have chosen and been chosen to do. While I place more value on the available legislative history than Justice Boehm does, in the end, I have decided he is right about what is the correct decision in this case.

---

4. In these instances, the governor's veto message appeared on the first day of the special session without a vote taken on that date. The indices do not reflect a subsequent vote.