ROCKFORD MUTUAL INSURANCE COMPANY, Appellant–Defendant,

v.

Terrey E. PIRTLE, Appellee–Plaintiff.

No. 77A01–0802–CV–94.

Court of Appeals of Indiana.

Aug. 11, 2009.

Rehearing Denied Oct. 28, 2009.

**62**

David P. Friedrich, Wilkinson, Goeller, Modesitt, Wilkinson, & Drummy, LLP, Terre Haute, IN, Attorney for Appellant.

David W. Stone IV, Stone Law Office & Legal Research, Anderson, IN, John P. Nichols, Anderson & Nichols, Terre Haute, IN, Attorneys for Appellee.

## OPINION

KIRSCH, Judge.

Rockford Mutual Insurance Company ("Rockford") appeals from a jury verdict in favor of Terrey E. Pirtle in his action against Rockford for breach of contract. Rockford raises the following issues for our review:

I.  Whether Pirtle's recovery under the policy is limited to the actual cash value of the building because of Pirtle's failure to comply with the repair and replacement cost policy provision of his policy;

II.  Whether Pirtle's suit was barred by the contractual one-year-limitation period provision in the policy; and

III.  Whether Pirtle's damages can include consequential damages and amounts exceeding policy limits.

We affirm.

## FACTS AND PROCEDURAL HISTORY

Pirtle purchased an historic building located at 900 Maple Avenue in Terre Haute, Indiana by obtaining a mortgage

for $140,250.00 and insured the building through a policy with Rockford. The building was used as a rental property while Pirtle was restoring it. By early 1999, the historic building was valued at $165,000.00; however, it was damaged in an accidental fire on November 11, 2000.

After the fire, Pirtle made a claim under his policy, and Rockford assigned the claim to one of its claim supervisors, who hired an independent adjuster to prepare a damage estimate for the building. The independent adjuster estimated the damage to the building at $79,907.49. Rockford's claim supervisor gave the independent adjuster authority to settle the claim for $80,000.00. Pirtle rejected the claim because it was not enough to satisfy the mortgage or to repair the building. Because of the damage to the building, Pirtle was unable to continue to lease the building to tenants.

Pirtle hired a contractor, Kevin Maher, who estimated the damage to the building at $232,915.39 in 2001.[1] A second Rockford claims supervisor, Andy Clark, was assigned to Pirtle's claim and accepted Maher's damage estimate after noticing that no other contractors had submitted a quote or would complete repairs using the independent adjuster's damage estimate. Clark then obtained authority to settle Pirtle's claim for up to $193,000.00, Rockford's policy limits for the dwelling.

Pirtle hired an attorney, David Bolk, who received an offer from Clark of $69,874.62, representing what Rockford considered to be the "actual cash value" of the building. Clark explained to Bolk that he arrived at this number by using Maher's estimate less depreciation. Bolk made a demand for the policy limits under Coverage A less a 10% discount. Clark informed Bolk that he could not pay the Coverage A policy limits because he was only authorized to offer the actual cash value of the building. Clark explained that, while Pirtle's policy included replacement cost coverage, Pirtle would only be entitled to payment under the replacement cost coverage once repairs or replacement of the building had been completed. Clark told Bolk that the actual cash value was an arbitrary figure used if the building was going to be repaired, and was often used as seed money to start repairs to insured buildings. Again, Clark offered what he considered to be the actual cash value of the building and proposed hiring a certified real estate appraiser to resolve the dispute over the actual cash value amount. Bolk did not respond to the offer.

The independent adjuster completed a comparative analysis in May 2001, which set the actual cash value of the building at $86,146.66. Pirtle retained other counsel[2] and filed suit against Rockford on September 24, 2001. Pirtle's complaint alleged breach of contract and bad faith. The bad faith claim was dismissed with prejudice when Rockford paid $86,146.66 for the building's actual cash value, which Pirtle accepted while continuing to contest the actual cash value used.

Rockford filed a motion for summary judgment alleging that Pirtle's recovery was limited to actual cash value because the building had not been repaired or replaced. Rockford argued that Pirtle was ineligible to receive payment for replacement cost coverage because he had not repaired or rebuilt the building. The motion for summary judgment was denied.

---

1. Maher submitted a repair estimate in 2005 of $330,111.00.

2. Pirtle's original counsel, David Bolk, currently presides over Vigo Superior Court Division III/Vigo Circuit Court.

Rockford filed a motion in limine seeking 1) to limit Pirtle's recovery to applicable policy limits and 2) to bar consequential damages. The trial court's order on the parties' motion in limine pleadings denied Rockford's attempts to limit Pirtle's recovery of consequential damages and amounts above policy limits.

At the conclusion of the jury trial, Rockford was found to be in breach of contract. The jury awarded Pirtle $124,149.55 under the insurance policy and $406,136.58 in consequential damages for an aggregate award of $524,286.13. Rockford's motion to correct error again sought to have Pirtel's award capped at policy limits. The trial court denied the motion to correct error. Rockford now appeals.

## DISCUSSION AND DECISION

■ A jury is to be afforded great latitude in making damage award determinations. *City of Carmel v. Leeper Elec. Servs., Inc.*, 805 N.E.2d 389, 393 (Ind.Ct. App.2004). A verdict will be upheld if the award falls within the bounds of the evidence. *Id.* On review of such an award, the appellate court will neither reweigh the evidence nor judge the credibility of the witnesses. The evidence will be looked at in a light most favorable to the judgment. *Id.* (quoting *City of Elkhart v. No–Bi Corp.*, 428 N.E.2d 43, 45 (Ind.Ct.App. 1981)).

### I. Actual Cash Value

■ Rockford argues that Pirtle is limited to recovering only the actual cash value of the building because Pirtle failed to repair and replace the building after the fire, a condition precedent to receiving payment under that coverage. In March of 2002, Rockford paid Pirtle $86,146.66, which was Rockford's calculation of the actual cash value.

Rockford's insurance policy provided Pirtle with replacement coverage up to $193,000.00 for the building, up to $8,000.00 for personal property, and up to $19,300.00 for fair rental value. Rockford's policy further provided as follows:

5. Loss Settlement. Covered property losses are settled as follows:

(c) Buildings under coverage A or B at replacement cost without deduction for depreciation, subject to the following:

(4) When the cost to repair or replace the damage is more than $1,000 or more than 5% of the amount of the insurance in this policy on the building, whichever is less, we will pay no more than the actual cash value of the damage until actual repair or replacement is completed.

*Appellant's App.* at 198–99. The parties appear to agree that the cost to repair or replace the building falls within the conditions of paragraph 5(c)(4) of Rockford's policy.

Rockford argues that the terms of the insurance contract are clear and unambiguous and must be given effect. Rockford urges this court to review the interpretation of this contract *de novo* because it is unambiguous. *See Liberty Ins. Corp. v. Ferguson Steel Co.*, 812 N.E.2d 228, 230 (Ind.Ct.App.2004) (review of unambiguous contracts is *de novo*). Rockford claims that Pirtle received all that he was entitled to receive from Rockford because he did not follow the terms of the contract. Rockford takes issue with Pirtle's alleged failure to first seek the actual cash value of the building, and once he received payment of the actual cash value, his use of the funds to satisfy the mortgage instead of commencing to repair or replace the building.

Here, the parties disputed the actual cash value. Clark testified that when there is a dispute over actual cash value of

a building, Rockford usually obtains a certified real estate appraisal to determine the actual cash value of the property. *Tr.* at 306–07. Rockford did not do that here. Because of the impasse, Pirtle struggled to meet his obligations under the mortgage. Pirtle was trapped in a no win situation. By the time he received the actual cash value payment in March of 2002 he was behind on the mortgage payments and had no rental income. Pirtle had little choice but to use the funds to satisfy the mortgage at a loss to the mortgage holder, which left nothing to start the repairs.

■ An actual cash value policy is a pure indemnity contract, the purpose of which is to make the insured whole but never to benefit him because a fire occurred. *See Travelers Indem. Co. v. Armstrong*, 442 N.E.2d 349, 352 (Ind.1982) (citing APPLEMAN ON INSURANCE 2d § 3823, at 218–19). "Replacement cost coverage reimburses the insured for the full cost of repairs, *if the insured repairs or rebuilds the building,* even if that results in putting the insured in a better position than he was before the loss." *Travelers,* 442 N.E.2d at 352 (emphasis in original). Replacement cost coverage is an optional coverage that may be purchased and added to a basic fire policy by endorsement and is more expensive because the rate of premiums is higher and the amount of insurance to which that rate applies is usually higher. *Id.* Replacement cost coverage meets the need expressed as follows:

> Since fire is an unwanted and unplanned for occurrence, why can't the owner of an older home buy insurance to cover the full cost of repair even if those repairs make it a better or more valuable building? Since at the time of fire the homeowner may be least able to pay for improvements, why can't that hazard be insured too? Instead of apportioning the cost of repair after a fire between the actual cash value, to be paid by the insurer, and the betterment to be paid by the insured, why can't the policyholder simply pay a higher premium each year but not have to pay anything more to have his home fully repaired in the event of fire?

*Id.* at 353. Any purported windfall to an insured who purchases replacement cost insurance is precisely what the insured contracted to receive in the event of a loss. *See Nahmias Realty, Inc. v. Cohen,* 484 N.E.2d 617, 622 (Ind.Ct.App.1985).

■ The dispute here is over Pirtle's failure to repair or replace the building. *COUCH ON INSURANCE* contains the following observation: "Even where actual replacement is mandated, compliance may be excused by the insurer's actions. The insurer's failure to advance the necessary funds to rebuild may have this effect." *COUCH ON INSURANCE* (3d ed.1995) § 176:59 at 176–52 "Replacement cost coverage was devised to remedy the shortfall in coverage which results under a property insurance policy compensating the insured for actual cash value alone. That is, while a standard policy compensating an insured for the actual cash value of damaged or destroyed property makes the insured responsible for bearing the cash difference necessary to replace old property with new property, replacement cost insurance allows recovery for the actual value of property at the time of loss, without deduction for deterioration, obsolescence, and similar depreciation of the property's value." *Id.* § 176:56 at 176–49.

Our courts have yet to address the issue of whether an insured could be excused from performance of a condition precedent contained in a fire insurance policy. *See Nahmias,* 484 N.E.2d at 623 (defense that completed rebuilding or replacement is required before liability for that coverage attaches available only to party to insur-

ance contract). However, in *McCahill v. Commercial Union Insurance Co.*, 179 Mich.App. 761, 775, 446 N.W.2d 579, 585 (1988), the Court of Appeals of Michigan found that the insured was excused from performing the condition precedent, i.e., completion of rebuilding or repair, because the insurer's actions hindered performance by the insured. Further, in *Zaitchick v. American Motorists Insurance Co.* 554 F.Supp. 209, 217 (U.S.D.C.S.D.N.Y.1982) the District Court for the Southern District of New York held that case law and equitable considerations supported the decision to award replacement costs under the endorsement to the fire policy even though repair and replacement had not been completed. The insureds were paid nothing by the insurer and had no money with which to begin rebuilding. *Id.*

Here, Pirtle indicated to Rockford that he wanted his replacement costs paid. Rockford offered Pirtle $80,000 in January 2001, that was to "cash out" the insurance policy, meaning that would be all the money Pirtle would receive, even though the policy limit under Coverage A was $193,000. *See Appellant's App.* at 295. Pirtle refused this offer as there was no contractor who could repair the building for that amount. Nearly six months later in May 2001, only after the mortgage foreclosure process had started (*Tr.* at 181), and the property had been condemned by the city (*Appellant's App.* at 336), did Rockford offer $69,874 with the balance of the $193,000 to be paid when the property was repaired. This is the *first* time Rockford made an actual cash value offer to Pirtle under 5(c)(4), and it came six months after the fire, at which time the property was already in jeopardy. At this point, Pirtle was in a very bad position to start any repairs.

The jury was instructed as follows:

When one party prevents the other from performing any part of the contract, the other party is excused from the remainder of his duties. The party excused may also recover for any work and any other damages sustained as a direct result of the prevention of performance. *Appellant's App.* at 383 (Final Instruction No. 12). Rockford did not object to this instruction. In finding in favor of Pirtle, the jury, pursuant to Final Instruction No. 12, must have found that Pirtle was excused from repairing the property due to Rockford's actions in handling Pirtle's claim. Final Instruction No. 12 is consistent with the equitable principles previously cited to in COUCH ON INSURANCE (*3d ed.1995*) § 176:59 at 176–52. It thus appears that Pirtle proceeded under provision 5(c)(4) of the insurance policy, which requires completion of repairs or replacement, but because of Rockford's actions in handling Pirtle's claim, specifically its actions in regards to the actual cash value payment, the jury excused the requirement, as Final Instruction No. 12 allowed it to do.

We acknowledge that other courts, including our own Seventh Circuit, have held that the contract must be strictly construed to require the completion of the repair or replacement before liability under the replacement cost endorsement attaches. *See e.g. Bourazak v. N. River Ins. Co.*, 379 F.2d 530, 532(7th Cir.1967)(complaint dismissed because insured failed to satisfy condition precedent for claim of loss); *W. Suburban Bank of Darien v. Badger Mut. Ins. Co.*, 947 F.Supp. 333, 336–37 (N.D.Ill.1996) (replacement cost valuation does not apply until repair or replacement of destroyed property). However, we are convinced that equitable principles win the day in this situation; otherwise, the repair or replacement endorsement paid for by Pirtle would be rendered illusory. Rockford had the abili-

ty to advance sums of money under that endorsement to assist in commencement of the rebuilding, and could have joined Pirtle in agreements entered into for repairs.

As for Rockford's argument that Pirtle should have proceeded under provision 5(c)(5) of the policy, which requires him to make a claim for loss or damage to the buildings on an actual cash value basis and then make a claim within 180 days after loss for any additional liability on a replacement cost basis, we do not need to address this argument since the jury apparently excused Pirtle's requirement to repair or replace under provision 5(c)(4) of the policy.

## II. Contractual One–Year Limitation Period

Rockford argues that Pirtle's suit against them was barred by a contractual one-year limitation period contained in the insurance policy. The provision reads as follows:

> **Suit Against Us.** No action shall be brought unless there has been compliance with the policy provisions and the action is started within one year of the loss.

*Appellant's App.* at 148–49.

██ Rockford is correct that one-year limitation periods in insurance contracts are valid and enforceable. *See Meridian Mut. Ins. Co. v. Caveletto,* 553 N.E.2d 1269, 1270 (Ind.Ct.App.1990). Rockford claims that although Pirtle's suit was brought within the one-year limitation period, Pirtle did not comply with the policy provisions requiring him to complete replacement or repair of the building. Because of our resolution of the previous issue, Rockford's argument here must fail.

## III. Policy Limits For Consequential Damages

██ Rockford claims that its liability should be capped at the policy limits. As previously discussed, Rockford paid Pirtle $86,146.66 in March 2002 for the actual cash value of the dwelling, and $8,659.20 for lost rents. Rockford claims that its dispute with Pirtle over the actual cash value was in good faith, thereby precluding an award of consequential damages. The jury awarded, and the trial court entered judgment of, $124,149.55 on the breach of contract claim and $406,136.58 for consequential damages for a total verdict of $524,286.13.

██ A party injured by a breach of contract may recover consequential damages. *Thor Elec., Inc. v. Oberle & Assocs., Inc.,* 741 N.E.2d 373, 381 (Ind.Ct.App. 2000). Consequential damages may be awarded when the non-breaching party's loss flows naturally and probably from the breach and was contemplated by the parties when the contract was made. *Thor,* 741 N.E.2d at 381. The party seeking damages must prove by a preponderance of the evidence that the breach was the cause in fact of its loss. *Id.* This generally limits consequential damages to reasonably foreseeable economic losses. *Berkel & Co. Contractors, Inc. v. Palm & Associates, Inc.,* 814 N.E.2d 649, 658 (Ind.Ct. App.2004).

Rockford claims that while consequential damage awards might be "recoverable as a matter of contract law, they might likely be precluded on a public policy analysis." *Reply Br.* at 8. Rockford disputes the trial court's reliance on *Indiana Insurance Co. v. Plummer,* 590 N.E.2d 1085 (Ind.Ct.App. 1992).

*Plummer* is a case involving the award of consequential damages to an insured for costs incurred during the course of seeking to recover under a fire policy. Rockford attempts to distinguish the cases upon which *Plummer* depends for the resolution of that case from the case at bar. Like

the insurer in *Plummer*, Rockford claims, in addition to its claim that damages should be restricted to policy limits, that 1) the consequential damages award should not stand because Rockford's dispute was in good faith, and 2) Pirtle's damages were not proximately caused by Rockford's conduct in handling Pirtle's claim. *See id.*, 590 N.E.2d at 1089. Rockford's argument must fail.

This court in *Plummer* examined the cases cited by the insurer in its efforts to limit its liability. We found that *Lloyds of London v. Lock*, 454 N.E.2d 81 (Ind.Ct. App.1983), a case later modified to cap the damage award at liability limits, had been abandoned to follow a different line of reasoning. In *Liberty Mutual Insurance Co. v. Parkinson*, 487 N.E.2d 162, 165 (Ind.Ct.App.1985), *abrogated on other grounds by, Erie Insurance Co. v. Hickman by Smith*, 622 N.E.2d 515 (Ind.1993), we held that although the insurer had settled with the insured for all of the benefits due under the insurance policy, the insurer was liable for damages to compensate the insured for the insurer's breach. While *Liberty* is a case involving breach of contract by failing to deal with its insured in good faith, the compensatory damage award was for expenditures proximately caused by the breach of contract. In *Burleson v. Illinois Farmers Insurance Co.*, 725 F.Supp. 1489, 1496 (S.D.Ind.1989), the court, quoting *Lawton v. Great Southwest Fire Insurance Co.* 118 N.H. 607, 392 A.2d 576, 579 (1978), stated, " 'the policy limits restrict the amount the insurer may have to pay in the performance of the contract, not the damages that are recoverable for its breach.' " This court in *Plummer* found that the *Burleson* court erroneously interpreted *Vernon Fire & Casualty Insurance Co. v. Sharp*, 264 Ind. 599, 349 N.E.2d 173 (Ind.1976) as restricting the recovery of consequential damages under a public policy analysis when they

arise from a good faith dispute. We held, in *Plummer*, that the holding in *Vernon* applied in the context of punitive damages, not consequential damages. 590 N.E.2d at 1091. Consequently, we find that the trial court did not err by awarding consequential damages in excess of policy limits, as the award was for Rockford's breach.

Lastly, we reject Rockford's argument that consequential damages were erroneously awarded because 1) the dispute was a good faith dispute and 2) the damages were not proximately caused by Rockford's breach. Our Supreme Court noted in *Vernon*, "a promisor's *motive* for breaching his contract is generally regarded as *irrelevant* because the promisee will be compensated for all damages proximately resulting from the promisor's breach." 349 N.E.2d at 180 (emphasis added). Here, Rockford's motive for delayed payment is irrelevant, therefore this argument as to good faith fails. Rockford further argues that its breach of contract was not the proximate cause of Pirtle's consequential damages, i.e., that the recovery for property taxes, utility bills, and an increase in the Maher quote in particular, were not reasonably foreseeable at the time the insurance contract was entered into. This argument too must fail.

Delayed payment, whether as a result of good or bad faith, will undoubtedly result in the failure of the owner's business. He cannot generate sufficient income to pay his bills because he has no business. The damages incurred from such inability to pay bills flow directly, and are proximately caused by, the insurer's failure to pay.

*Plummer*, 590 N.E.2d at 1092.

The fire occurred on November 11, 2000, and the jury trial concluded on October 17, 2007. The cost of repairs, utilities, and property taxes were likely to increase dur-

ing the seven-year period between the damage to the building and the jury's award. Those damages flow directly from and are proximately caused by Rockford's failure to pay. Had Pirtle been able to use the building as a rental property during those years, the rent likely would have increased.

██ By analogy, in a wrongful death action, this court held that "[a]n awareness of general inflation and a constant depreciation and cheapening of money is within the zone of discretion given to the trier of facts when assessing damages." *See State v. Daley,* 153 Ind.App. 330, 337, 287 N.E.2d 552, 556 (Ind.Ct.App.1972). In order to justify a reversal on grounds of excessive damages, the amount of damages assessed must appear to be so outrageous as to impress the court as being motivated by passion, prejudice, and partiality. *Id.* Reversal is not justified, however, if the amount of damages awarded is within the scope of the evidence before the court. *Id.*

██ Here, the jury verdict included $124,149.55 under the insurance policy, and consequential damages of $406,136.58. The award under the insurance policy was the remainder of the contractual damages Pirtle was eligible to receive. Accordingly, that award is within the scope of the evidence. The net bid by Maher Construction was $205,962.27; the utilities and debris removal award was $16,262.31; and the loss of rental income was $177,912.00. Evidence of the loss of personal property in excess of $6,000.00 was admitted. Accordingly, the jury's award was within the scope of the evidence.

Affirmed.

VAIDIK, J., and CRONE, J., concur.