## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Feb 25 2020, 9:46 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Robert J. Palmer
May Oberfell Lorber
Mishawaka, Indiana

ATTORNEY FOR APPELLEES

Jacqueline Sells Homann
Jones Obenchain, LLP
South Bend, Indiana

## IN THE
# COURT OF APPEALS OF INDIANA

David Buck,

*Appellant-Defendant/Counterclaim Plaintiff,*

v.

Samaron Corporation, et al.,

*Appellees-Plaintiffs/Counterclaim Defendants.*

February 25, 2020

Court of Appeals Case No.
19A-PL-1024

Appeal from the Elkhart Superior Court

The Honorable Charles Carter Wicks, Judge

Trial Court Cause No.
20D05-1209-PL-201

**Bailey, Judge.**

# Case Summary

David Buck ("Buck") is a former employee and former shareholder of Samaron Corporation ("Samaron") who entered into a non-competition agreement with Samaron (the "Agreement"). Samaron and shareholder Daniel Holtz ("Holtz") (collectively, the "Plaintiffs") filed a lawsuit against Buck alleging that Buck (1) breached restrictive covenants contained in the Agreement and (2) breached fiduciary duties owed to the Plaintiffs. Buck filed a counterclaim and later filed a motion for summary judgment, which the trial court partially granted in favor of Buck. A bench trial was held on the remaining issues, with the trial court ruling in favor of the Plaintiffs. Buck now appeals. The Plaintiffs cross-appeal.

We affirm.

# Issues

Buck presents the following consolidated and restated issues:

   I.    Whether the trial court erred by partially denying the motion for summary judgment because a particular restrictive covenant in the Agreement is unenforceable.

   II.   If Buck breached the Agreement, whether the damages are too speculative to support an award under the Agreement.[1]

---

[1] Buck also argues that the court erred to the extent it found Buck breached fiduciary duties. As we conclude that the damages award is supported under a breach-of-contract theory, we need not address this contention.

The following issues are presented on cross-appeal:

> III. Whether the trial court erred by partially granting Buck's motion for summary judgment on a claim that Buck breached a fiduciary duty by retaining insurance proceeds.

> IV. Whether the trial court abused its discretion because it did not award the full amount of requested attorney fees and did not address the request for $3,618.01 in costs.

# Facts and Procedural History

Samaron—doing business as Troyer Products—supplies parts to the recreational-vehicle industry. In 2005, Buck and Holtz acquired shares of Samaron from Ron Clark ("Clark") and his wife. After the sale, Buck held 39% while Holtz held 61%. When Buck acquired the shares of Samaron, he signed the Agreement, which is titled "Employment and Noncompete Agreement." Tr. Vol. 6 at 5. The Agreement contains several restrictive covenants. Section 4(a) addresses the ability to work for a competitor. That Section 4(A)—which we will refer to as the Business Activities Covenant—provides as follows:

> [D]uring the Restricted Period, Employee agrees that he shall not, directly or indirectly, render services to, become employed by, associated with, participate or engage in, or otherwise become connected with (other than solely as a less than five percent (5%) investor through purchases of securities in a publicly traded company) any person, partnership, corporation, or other entity engaged in a business competitive to that of the Employer and its subsidiaries in any state where the Employer has Customers during the term of Employee's employment with the

Employer and will not solicit any Customer of the Employer on behalf of any business competitive to the Employer.

*Id.* at 5-6. Separate from the Business Activities Covenant, Section 4(b) addresses the solicitation of customers. That Section 4(b)—which we will refer to as the Non-Solicitation Covenant—provides as follows:

> During the Restricted Period, Employee SHALL NOT contact or solicit either for Employee or for others, any of Employer's Customers or Clients or any prospective Customers or Clients with whom Employee has had contact or solicited at any time in the twelve (12) month period of time preceding the termination of Employee's employment, to (1) divert or influence or attempt to divert or influence any business of Employer to a Competitor of Employer; (2) market, distribute, sell, or provide products or services in competition with Employer; or (3) otherwise interfere in any fashion with Employer's business or operations then being conducted by Employer.

*Id.* at 6. The Agreement defines the Restricted Period as "the period of time during Employee's employment with Employer and for a period of three (3) years from the date of termination of Employee's employment with Employer for any reason." *Id.* at 7. The Agreement defines "Customer" or "Client" as "any person or entity which, within the preceding twelve (12) month period, used or purchased or contracted to use or purchase any services or products from Employer." *Id.* It defines Employer as Samaron, and Employee as Buck.

[6] The Agreement contemplates the recovery of monetary damages: "To the extent calculable, Employer shall be entitled to recover from Employee, monetary damages, including lost profits." *Id.* at 8. The Agreement also

contains the following provision concerning costs and attorney's fees: "Employer shall be entitled to recover from Employee all costs, expenses, and reasonable attorneys' fees incurred by Employer in seeking either enforcement of this Agreement or damages for its breach or in defending any action brought by Employee to challenge or construe the terms of this Agreement." *Id.*

There was a key-man life-insurance policy for Clark, who died in November 2011. Samaron held a board meeting in December 2011 at which Holtz insisted that Buck was the beneficiary of the policy—having been told as much by the insurance company. However, Buck insisted that Samaron was the beneficiary. At the meeting, it was determined that "the check will come to Troyer Products but it's going to be disbursed to David Buck." Appellant's App. Vol. 5 at 6. The insurance company paid the proceeds—$1 million—directly to Buck.

During the latter part of his employment with Samaron, Buck managed the day-to-day operations of Troyer Products. Buck's relationship with Holtz deteriorated, and Buck voluntarily quit his job on August 2, 2012. At that point, Buck remained a shareholder of Samaron. Buck began working for a different entity—BD Custom—of which Buck was an owner. BD Custom is in the business of manufacturing plastic extrusions. BD Custom was a vendor of Troyer Products, supplying plastic extrusions that Troyer Products then resold.

Shortly after quitting his job at Samaron, Buck received a phone call from David Snyder ("Snyder"). Snyder worked for KZ, which had been purchasing plastic extrusions from Troyer Products. Buck volunteered that he had left

Troyer Products. It was not long until Buck went to KZ's facility and BD Custom began selling plastic extrusions directly to KZ. Around this time, BD Custom imposed on Troyer Products a 25% price increase for plastic extrusions.

[10] In July 2012, Samaron sued the insurance company in federal court, alleging it breached the insurance contract by paying the proceeds to Buck. The federal court granted summary judgment in favor of the insurance company. *Samaron Corp. v. United of Omaha Life Ins. Co.*, No. 3:12-CV-397, 2015 WL 13675887, at *1-9 (N.D. Ind. Sept. 30, 2015), *aff'd*. The court found that Samaron was the beneficiary, but—through the board meeting—it waived the right to collect the proceeds from the insurance company. The Seventh Circuit affirmed. *Samaron Corp. v. United of Omaha Life Ins. Co.*, 822 F.3d 361, 362-364 (7th Cir. 2016).

[11] In September 2012, the Plaintiffs filed the instant action. They claimed that Buck breached the Agreement. They also claimed that Buck breached his fiduciary duties by—*inter alia*—retaining the insurance proceeds. Buck counterclaimed. He later moved for summary judgment, arguing that the doctrine of collateral estoppel precluded the claim regarding the insurance proceeds. Buck also asserted that the Agreement was unenforceable, and he was entitled to summary judgment on all breach-of-contract claims. In so arguing, Buck focused on the Business Activities Covenant. He argued that the covenant was unreasonable, and the presence of an unenforceable covenant rendered the Agreement unenforceable. The court granted summary judgment to Buck on the insurance-related claim. The court otherwise denied the motion.

[12]   A bench trial commenced in October 2018.  The trial court ultimately ruled against Buck, determining that Buck was "in clear violation" of the Agreement. Appellant's App. Vol. 2 at 52.  As to damages, the trial court determined that Buck was liable for (1) $85,000 in lost profits for lost sales to KZ and (2) $40,000 in lost profits in the extrusion business due to the price increase.  The court also concluded that Samaron was entitled to attorney's fees "as to that portion of [the] claim as to Buck's solicitation of KZ in violation of [the Agreement] and for actions contributing to . . . economically forcing Troyer [Products] out of the market for . . . extrusion products."  *Id.* at 60.  Samaron subsequently requested attorney's fees of $77,288.49 and costs of $3,618.01. The court awarded attorney's fees of $28,580.75.  It did not address costs.

[13]   Buck now appeals.  The Plaintiffs cross-appeal.

# Discussion and Decision

## Standards of Review

[14]   To the extent the parties appeal the ruling on summary judgment, our review is *de novo*.  *See Kenworth of Indianapolis, Inc. v. Seventy-Seven Ltd.*, 134 N.E.3d 370, 376 (Ind. 2019); *see also Keith v. Mendus*, 661 N.E.2d 26, 35 (Ind. Ct. App. 1996) ("[A] party who fails to bring an interlocutory appeal from the denial of a motion for summary judgment may nevertheless pursue appellate review after the entry of final judgment."), *trans. denied*.  Summary judgment is proper "if the designated evidentiary matter shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of

law." Ind. Trial Rule 56(C). Moreover, Trial Rule 56(H) specifies that "[n]o judgment rendered on the motion shall be reversed on the ground that there is a genuine issue of material fact unless the material fact and the evidence relevant thereto shall have been specifically designated to the trial court." In conducting our review, we view the designated evidence in a light most favorable to the non-movant. *Murray v. Indianapolis Pub. Schs.*, 128 N.E.3d 450, 452 (Ind. 2019).

[15] As to the matters tried to the bench, where—as here—the trial court entered *sua sponte* findings and conclusions, we "shall not set aside the findings or judgment unless clearly erroneous" and shall give "due regard . . . to the opportunity of the trial court to judge the credibility of the witnesses." T.R. 52(A). The *sua sponte* findings control the issues they cover, with a general-judgment standard controlling "other issues . . . not covered by such findings." T.R. 52(C). In conducting our review, we look to whether the evidence supports the findings and the findings support the judgment. *See Town of Brownsburg v. Fight Against Brownsburg Annexation*, 124 N.E.3d 597, 601 (Ind. 2019). "We will not set aside findings unless they are clearly erroneous—i.e., the record contains no facts supporting them either directly or inferentially." *Id.* The "ultimate judgment— who wins on which counts or claims, and who loses—must follow from the conclusions of law and is clearly erroneous if the court applied the 'wrong legal standard to properly found facts.'" *Id.* (quoting *Town of Fortville v. Certain Fortville Annexation Territory Landowners*, 51 N.E.3d 1195, 1198 (Ind. 2016)). We review questions of law *de novo. Id.* Moreover, where a contract is

unambiguous, the meaning of the contract is a question of law that is subject to *de novo* review. *See In re Ind. State Fair Litig.*, 49 N.E.3d 545, 548 (Ind. 2016).

## Enforceability of the Restrictive Covenants

[16] "Indiana courts have generally recognized and respected the freedom to contract." *Pathfinder Commc'ns Corp. v. Macy*, 795 N.E.2d 1103, 1109 (Ind. Ct. App. 2003). "However, covenants not to compete are in restraint of trade and are not favored by the law." *Id.* Covenants not to compete include promises to refrain from (a) engaging in competitive activities, (b) soliciting customers, (c) recruiting or hiring certain employees, and (d) disclosing sensitive business information. *See generally Heraeus Med., LLC v. Zimmer, Inc.*, 135 N.E.3d 150, 152-53 (Ind. 2019); *Sharvelle v. Magnante*, 836 N.E.2d 432, 440 (Ind. Ct. App. 2005). These types of provisions are enforceable "only if they are reasonable." *Heraeus*, 135 N.E.3d at 153. Importantly, the enforceability of these restrictive covenants is not an all-or-nothing matter. Indeed, as was the case in *Sharvelle*, it is possible for a contract to contain both unenforceable **and** enforceable restrictive covenants. 836 N.E.2d at 440 (determining that a contract contained (1) an unenforceable restriction on working for a competitor and (2) an enforceable restriction on solicitation). To be enforceable, an anti-competitive restrictive covenant must be "reasonable in scope as to the time, activity, and geographic area restricted." *Cent. Ind. Podiatry, P.C. v. Krueger*, 882 N.E.2d 723, 729 (Ind. 2008). In this context, reasonableness is a question of law. *Id.*; *Raymundo v. Hammond Clinic Ass'n*, 449 N.E.2d 276, 280 (Ind. 1983).

In seeking summary judgment on all breach-of-contract claims, Buck focused on the Business Activities Covenant. *See* Appellant's App. Vol. 2 at 90. He argued—and reasserts on appeal—that the Business Activities Covenant is unenforceable. Critically, Buck argued below that an unenforceable Business Activities Covenant renders the Agreement unenforceable—so he is entitled to summary judgment on **all** breach-of-contract claims. Buck reasserts this all-or-nothing argument on appeal: "[I]f a provision of an agreement is unreasonable, the entire agreement is unenforceable." Reply Br. of Appellant at 10.

Buck misstates Indiana law. The Indiana Supreme Court has explained that, under the blue-pencil doctrine, "a court may excise unreasonable, divisible language from a restrictive covenant—by erasing those terms—until only reasonable portions remain." *See Heraeus*, 135 N.E.3d at 153. Here, the Agreement contains covenants other than the Business Activities Covenant. Indeed, the Non-Solicitation Covenant is in a separate subsection, so it is possible to wholly excise the Business Activities Covenant without disturbing the Non-Solicitation Covenant. *See, e.g.*, *Sharvelle*, 836 N.E.2d at 440 (involving a contract with separate restrictive covenants—one of which was unenforceable, the other enforceable). Further, the Agreement contains a severability clause: "Should any part of this Agreement be unenforceable or invalid for any reason, the remainder of this Agreement shall be deemed valid and enforceable." Tr. Vol. 7 at 9. Buck did not address the severability clause in his motion for summary judgment—and we discern no reason why it would not apply.

[19] Ultimately, *assuming arguendo* Buck demonstrated that the Business Activities Covenant is unenforceable, Buck did not pursue summary judgment on only claims arising under the Business Activities Covenant. Rather, Buck took an all-or-nothing approach, arguing he was entitled to summary judgment on all breach-of-contract claims. Buck failed to demonstrate he was—as contended—entitled to summary judgment on all breach-of-contract claims, so we cannot say the court erred in declining to grant summary judgment on all such claims.

[20] Moreover, at trial, Buck did not raise the issue of partial enforceability. Indeed, Buck did not ask the trial court to consider whether some—but not all—of the Agreement is enforceable.[2] On appeal, Buck suggests that his motion for summary judgment encompassed that argument in the alternative. However, the record discloses that Buck did not clearly delineate that argument. We decline to consider argument not made below and will treat the Agreement as though all provisions are enforceable. *See Franklin Bank & Tr. Co. v. Mithoefer*, 563 N.E.2d 551, 553 (Ind. 1990) ("A party cannot change its theory and on appeal argue an issue which was not properly presented to the trial court.").

---

[2] Buck declined to give an opening statement, instead directing the court to a trial brief. Buck also declined to give a final argument, instead filing proposed findings and conclusions. Those documents are not contained in the appendices—and Buck has not argued that those documents address partial enforceability.

# Damages

Under the common law, a party injured by a breach of contract may recover damages. *See generally* Rest. (Second) of Contracts § 344 (Am. Law Inst. 1981). "Damages are not recoverable for loss that the party in breach did not have reason to foresee as a probable result of the breach when the contract was made." *Id.* § 351; *Rockford Mut. Ins. Co. v. Pirtle*, 911 N.E.2d 60, 67 (Ind. Ct. App. 2009), *trans. denied*. However, "when the non-breaching party's loss flows naturally and probably from the breach and was contemplated by the parties when the contract was made," the damages are potentially recoverable. *Rockford*, 911 N.E.2d at 67. Nevertheless, as private law between the parties, a negotiated contract may include provisions that modify—or opt out of—the common law. *See State v. Int'l Bus. Machs. Corp.*, 51 N.E.3d 150, 159-60 (Ind. 2016) ("Applying the specific terms agreed to by the parties rather than the common law default rule is consistent with Indiana contract law principles."). Indeed, a contract may limit remedies for breach or specify parameters for the recoverability of damages. *See id.*; *Am. Consulting, Inc. v. Hannum Wagle & Cline Eng'g*, 136 N.E.3d 208 (Ind. 2019) (involving a liquidated-damages provision).

In general, a party "must prove by a preponderance of the evidence that the breach was the cause in fact of its loss." *Rockford*, 911 N.E.2d at 67. Moreover, damages must be shown with "reasonable certainty"—*i.e.*, "[a]bsolute certainty is not required." *Connersville Wagon Co. v. McFarlan Carriage Co.*, 76 N.E. 294, 297 (Ind. 1905). "Lost profits are not uncertain where there is testimony that, while not sufficient to put the amount beyond doubt, is sufficient to enable the

factfinder to make a fair and reasonable finding as to the proper damages." *Marathon Oil Co. v. Collins*, 744 N.E.2d 474, 482 (Ind. Ct. App. 2001).

[23] Here, the court found that Buck breached the Agreement by soliciting KZ and selling plastic extrusions to KZ, conduct that resulted in $85,000 in lost profits due to lost sales. The court also found that Buck breached the Agreement by causing BD Custom to impose a 25% price increase on plastic extrusions, conduct that resulted in $40,000 in lost profits due to diminished profit margins.

[24] At trial, Holtz explained that he calculated the lost profits based on sales history. As to the $85,000 in lost profits pertaining to KZ, Holtz "calculated the trailing 12 months margin . . . prior to August 2nd"—the date Buck quit—"and then the ensuing 12 months." Tr. Vol. 2 at 216. "[I]n that previous 12 months [Troyer Products] had sold $202,000 of extrusions [to KZ] and the margin was [$85,000,] and in the following 12 months [it] filled a de minimus [*sic*] number of orders [for KZ]." *Id.* at 217. Holtz testified that Troyer Products "clearly lost that account" and, "all other things being equal[,] would have had $85,000 worth of margin. . . ." *Id.* On redirect, Holtz again explained that, in the trailing twelve months, Troyer Products sold $202,000 of extrusions to KZ with a margin of $85,000. Holtz explained that, "knowing that the economy did not deteriorate," he "would expect and predict" the margin would be the same or higher for future sales, but "assum[ed] that it was constant." Tr. Vol. 3 at 86.

[25] As to the price increase, Holtz explained that Troyer Products found another supplier. However, to stay competitive, Troyer Products "had to both lower

[its] price and pay more for the product." Tr. Vol. 2 at 219-20. Troyer Products "experienced roughly a 5 percent loss in gross margin" for extrusions. *Id.* at 220. Comparing "the previous year to the next year," it "suffered [$]40,000 in reduced margin in selling extrusions" to key customers it retained. *Id.*

[26] When asked whether these damages were "somewhat speculative," Holtz responded that Troyer Products "had a long and uninterrupted history of providing extrusion product[s] to KZ . . . and to many other customers." Tr. Vol. 3 at 28. Holtz explained that, when calculating damages, he "sought not to be nit picky [*sic*]" but to instead "focus on those very large customers where [Troyer Products] had a very long, uninterrupted history of providing extrusion product[s] with virtually very little price pressure or request to re-quote." *Id.*

[27] Buck argues that the damages are too speculative. In so arguing, he selectively quotes testimony elicited on cross-examination and during a Trial Rule 30(B)(6) deposition. For example, Buck points out that Holtz agreed that the damages were "just an estimate" and that assessing lost profits is difficult. *Id.* at 45. Buck also points out that Holtz responded affirmatively when asked whether Holtz had "already told us the calculation of damages . . . would be speculative based on looking at the financial records of Troyer [Products]." *Id.* at 47-48.

[28] Buck focuses on this testimony—and similar testimony—concerning the nature of the damages. He directs us to the following provision in the Agreement: "**To the extent calculable**, Employer shall be entitled to recover from Employee, monetary damages, including lost profits." Tr. Vol. 6 at 8 (emphasis added).

Focusing on the bolded clause, Buck asserts that the Agreement does not permit recovering the $85,000 and $40,000 because the amounts are not calculable.

[29] Yet, Holtz explained how he calculated those amounts. Moreover, to the extent Buck suggests that the provision requires damages to be proved to a certainty, we cannot agree with this reading. Rather, the provision expressly provides a right to recover monetary damages, including lost profits. The Agreement secures this right—irrespective of whether the common law would permit recovering those damages. However, the provision does not eliminate remedies under the common law. Thus, the provision has no impact on the application of the common-law approach to the recoverability of lost profits.

[30] As to that common-law approach, Buck argues that the damages calculation is still too speculative to support the award. However, regardless of Buck's attempts to elicit conclusory testimony on this issue, Holtz explained how he calculated the damages. We conclude that Holtz's testimony about his calculations was sufficient to enable the factfinder to make a fair and reasonable finding as to the amount of lost profits. *See, e.g.*, *Marathon*, 744 N.E.2d at 482.

## Insurance Proceeds

[31] Below, the Plaintiffs claimed that Buck breached a fiduciary duty by retaining the insurance proceeds. Determining that the doctrine of collateral estoppel barred this claim, the court granted summary judgment in favor of Buck on this issue. Holtz now cross-appeals, challenging the grant of summary judgment.

[32] Collateral estoppel—also known as issue preclusion—"bars . . . relitigation of the same fact or issue where that fact or issue was necessarily adjudicated in a former lawsuit and that same fact or issue is presented in a subsequent suit." *Nat'l Wine & Spirits, Inc. v. Ernst & Young, LLP*, 976 N.E.2d 699, 704 (Ind. 2012).

[33] The Plaintiffs concede that collateral estoppel applies to Samaron's claim: "In a nutshell, Buck says Samaron waived its right to the life-insurance proceeds during a board meeting. A federal court found this to be true and Buck says it can't be re-litigated. He's right." Reply Br. of Cross-Appellants at 5. On cross-appeal, Holtz focuses on whether he is "entitled to his day in court on whether Buck breached his duty by taking a million dollars that didn't belong to him." *Id.* at 7. Thus, Holtz challenges whether the doctrine applies to **his** claim.

[34] "A claim for breach of fiduciary duty requires proof of three elements: (1) the existence of a fiduciary relationship; (2) a breach of the duty owed by the fiduciary to the beneficiary; and (3) harm to the beneficiary." *Farmers Elevator Co. of Oakville, Inc. v. Hamilton*, 926 N.E.2d 68, 79 (Ind. Ct. App. 2010), *trans. denied*. Holtz claims that Buck breached a fiduciary duty by retaining the insurance proceeds. Assuming *arguendo* that Buck breached a duty, any harm to Holtz—as shareholder—would stem from Samaron being denied its right to have the proceeds in its coffers. In other words, if there is no harm to Samaron, there is no harm to Holtz. Because Holtz concedes that Samaron waived its right to the proceeds, Holtz cannot demonstrate that Samaron was harmed.

[35] We cannot say the court erred in granting summary judgment on the claim.

# Costs and Attorney's Fees

[36] Samaron cross-appeals, claiming it is entitled to the full amount of attorney's fees and costs requested.[3] The amount of attorney's fees recoverable "is left to the sound discretion of the trial court." *Fischer v. Heymann*, 12 N.E.3d 867, 874 (Ind. 2014). We will reverse a fee award if the amount awarded is clearly against the logic and effect of the facts and circumstances before the trial court. *Hays v. Hockett*, 94 N.E.3d 300, 311 (Ind. Ct. App. 2018), *trans. denied*.

[37] "Indiana has consistently followed the American Rule" whereby, "in the absence of statutory authority or an agreement between the parties to the contrary—or an equitable exception—a prevailing party has no right to recover attorney fees from the opposition." *Loparex, LLC v. MPI Release Techs., LLC*, 964 N.E.2d 806, 816 (Ind. 2012) (footnote omitted). Here, Samaron asserts that the Agreement contains a fee-shifting provision, but it declines to direct us to that provision. *See* Ind. Appellate Rule 46(B) (providing that, in general, "[t]he appellee's brief shall conform to Section A of this Rule"); App. R. 46(A)(8)(a) (requiring that "[e]ach contention must be supported by citations to the authorities, statutes, and the Appendix or parts of the Record on Appeal relied

---

[3] Buck responds by challenging the adequacy of the evidence supporting Samaron's request for attorney's fees. To the extent Buck is attempting to challenge the amount awarded to Samaron, Buck failed to present this issue in his Appellant's Brief. As the Cross-Appellee, Buck may not take a second bite at the apple. *See generally* Ind. Appellate Rule 46(A)(8) (specifying that the argument section of an appellant's brief "shall contain the appellant's contentions why the trial court . . . committed reversible error"); App. R. 46(D)(3) (providing that "[t]he appellant's reply brief shall address the arguments raised on cross-appeal").

on"); *Barth v. Barth*, 693 N.E.2d 954, 956 (Ind. Ct. App. 1998) (noting that appellate courts "are unwilling to sift through a record"), *trans. denied*.

[38] In any case, the Agreement provides that Samaron is entitled to recover "all costs, expenses, and reasonable attorneys' fees incurred by Employer in seeking either enforcement of this Agreement or damages for its breach or in defending any action brought by Employee to challenge or construe the terms of this Agreement." Tr. Vol. 6 at 8. The court provided the following explanation for awarding less than the full amount of requested attorney's fees:

> The itemization of attorneys' fees submitted by [Samaron] contained references to work on other legal matters which the court has excluded in this calculation of attorney's fees, namely, preparation of a complaint and work with regard to a preliminary injunction, legal work with regard to a protective order, participation in a motion for summary judgment and litigation in Federal Court concerning an insurance policy of which David Buck was the eventual beneficiary. Such matters are not directly related to the claim which was successful in this cause.

Appellant's App. Vol. 2 at 67. The court did not address the issue of costs.

[39] Samaron asserts that "the verified application for attorney fees and the accompanying affidavits—the only evidence presented to the court—laid out specifically the meticulous steps counsel took to include only those fees related to the [A]greement." Br. of Appellees at 34. Yet, consistent with the court's

findings and conclusions, the request for attorney's fees shows thousands of dollars attributable to work on matters that are not exclusive to the Agreement.[4]

[40] At bottom, Samaron contends that the court was obligated to accept assertions that the fees pertained to the Agreement. However, where—as here—the accompanying documents contradict those assertions, we cannot say that the court is constrained to award the full amount requested. *See Lowery v. State*, 471 N.E.2d 258, 262 (Ind. 1984) (observing that a trial court is "not bound to accept the evidence presented as to the reasonable value of an attorney's services" (quoting *Canaday v. Canaday*, 467 N.E.2d 783, 785 (Ind. Ct. App. 1984))).

[41] Samaron also cursorily asserts that "the employment agreement was the only basis for injunctive relief," and so the trial court erred when it did not award the attorney's fees associated with the preliminary injunction. Br. of Appellees at 34. However, Samaron has not directed us to a copy of the preliminary injunction or provided a record citation that would support its contention. *See Barth*, 693 N.E.2d at 956 (declining to sift through the appellate record).

[42] Having reviewed the matter, we cannot say that Samaron demonstrated entitlement to the full amount of requested attorney's fees. As to costs,

---

[4] For example, the Plaintiffs highlighted line items of $1,475; $500; and $180 on an invoice from January 8, 2016. Appellees' App. Vol. 3 at 9. The description of services for each highlighted item relates to general discovery matters. Indeed, the description does not specify that the work pertained only to litigation under the Agreement. Yet, the Plaintiffs sought the full amount. *See* Appellees' App. Vol. 2 at 60 (requesting $2,155 from the January 8, 2016 invoice). Moreover, the Plaintiffs also sought to recover the full amount of line items that involved preparing and amending the complaint. *See id.* at 61, 66 & 67-68.

Samaron may have been entitled to the $3,618.01 in requested costs. However, because that amount is *de minimis*, we decline to disturb the order of the court. *See, e.g.*, *D & M Healthcare, Inc. v. Kernan*, 800 N.E.2d 898, 900 (Ind. 2003) (discussing and applying the "practical doctrine" of *de minimis non curat lex*).

# Conclusion

[43] The trial court did not err in denying Buck's motion for summary judgment on the breach-of-contract claims. Moreover, because Holtz conceded that Samaron waived any right to the insurance proceeds, we cannot say the trial court erred in granting summary judgment to Buck on the claim that Buck breached a fiduciary duty by retaining those insurance proceeds. We discern no failure of proof with respect to damages. Finally, as to fees and costs, Samaron has not demonstrated it is entitled to all requested fees—and the unrewarded costs are *de minimis*. We therefore fully affirm the trial court.

[44] Affirmed.

Kirsch, J., and Mathias, J., concur.